ACCEPTED
15-25-00018-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
5/14/2025 5:28 PM
CHRISTOPHER A. PRINE
CLERK

NO. 15-25-00018-CV

IN THE COURT OF APPEALS
FOR THE FIFTEENTH JUDICIAL DISTRICT
AT AUSTIN, TEXAS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
5/14/2025 5:28:47 PM
CHRISTOPHER A. PRINE
Clerk

**PUBLIC UTILITY COMMISSION OF TEXAS,**

*Appellant / Cross-Appellee,*

v.

**CITY OF DENTON, OPERATING AS
DENTON MUNICIPAL ELECTRIC,**

*Appellee / Cross-Appellant.*

On Appeal from the 459th Judicial Court,
Travis County, Texas
Cause No. D-1-GN-23-008974

**BRIEF FOR CROSS-APPELLANT**

JOSE E. DE LA FUENTE
State Bar No. 00793605
GABRIELLE C. SMITH
State Bar No. 24093172
JAMIE L. MAULDIN
State Bar No. 24065694
ROSLYN M. WARNER
State Bar No. 24117520
**LLOYD GOSSELINK
  ROCHELLE & TOWNSEND, P.C.**
816 Congress Ave., Suite 1900
Austin, Texas 78701
(512) 322-5800
(512) 472-0532 (fax)

**ATTORNEYS FOR CROSS-APPELLANT**

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

| | |
|---|---|
| **Cross-Appellants:** | **Attorneys for Cross-Appellants:** |
| City of Denton, operating as Denton Municipal Electric | Jose E. de la Fuente<br>Gabrielle C. Smith<br>Jamie L. Mauldin<br>Roslyn M. Warner<br>Lloyd Gosselink<br>  Rochelle & Townsend, P.C.<br>816 Congress Avenue, Suite 1900<br>Austin, Texas  78701<br>Telephone: (512) 322-5800<br>Facsimile:  (512) 472-0532 |
| **Cross-Appellee:** | **Attorneys for Cross-Appellee:** |
| Public Utility Commission of Texas | John R. Hulme<br>Jordan Pratt<br>Office of the Attorney General of Texas – Environmental Protection Division<br>P.O. Box 12548 (MC-066)<br>Austin, Texas 78711-2548 |
| **Intervenor:** | **Attorneys for Intervenor:** |
| Texas Industrial Energy Consumers | Katherine L. Coleman<br>Michael A. McMillin<br>John R. Hubbard<br>O'Melveny & Myers, LLP<br>303 Colorado St., Suite 2750<br>Austin, Texas 78701<br>Telephone: (737) 261-8600 |

**Intervenor:**

Office of Public Utility Counsel

**Attorneys for Intervenor:**

Sharbel A. Sfeir
Justin Swearingen
Chris Ekoh
Office of Public Utility Counsel
1701 N. Congress Avenue
Suite 9-180
Austin, Texas 78701

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................ 4

GLOSSARY OF TERMS .................................................................... 9

STATEMENT OF THE CASE ........................................................... 11

INTRODUCTION ............................................................................. 13

STATEMENT REGARDING ORAL ARGUMENT ............................. 19

ISSUES PRESENTED FOR REVIEW ............................................. 20

STANDARD OF REVIEW ................................................................ 22

STATEMENT OF FACTS ................................................................ 25

    A.    The Public Utility Regulatory Act and the Public Utility Commission of Texas established. ........................... 25

    B.    The City of Denton operates its municipally owned utility, Denton Municipal Electric. ...................................... 25

    C.    The Commission's authority over wholesale transmission rates. ............................................................... 26

    D.    DME filed an Application to change its wholesale transmission rates. ............................................................... 28

    E.    DME sought judicial review. ............................................... 31

SUMMARY OF THE ARGUMENT ................................................... 33

ARGUMENT & AUTHORITIES ....................................................... 38

    A.    The Commission unlawfully denied inclusion of DME's 6% ROI component of its GFT in TCOS Rates ............................................................................... 38

        1.    GFT as part of the TCOS ratemaking picture. ....................................................................... 39

            a.    Role of franchise fee. ........................................ 40

            b.    Role of ROI. ....................................................... 42

2.  Disallowing DME's 6% ROI violates longstanding law by leaving DME with insufficient return dollars. ............................ 43

3.  The Commission's exclusion of the 6% ROI is not based on any established legal authority, or even its own precedent. .......................................... 47

  a.  The Commission discriminatorily imposes an arbitrary standard to disallow the 6% ROI. ............................... 47

  b.  The language of PURA Chapter 35 supports inclusion of DME's 6% ROI transfer. ................................................ 54

4.  DME's ROI component is comparable to other utilities' payments to the City. ............................ 56

5.  The Commission's decision negates the right to make a GFT under Texas law ................................ 62

B.  Requiring DME to file an interim TCOS application finds no basis in enabling statutory authority or in the administrative record. .......................... 64

CONCLUSION AND PRAYER ............................................................ 70

CERTIFICATE OF COMPLIANCE ...................................................... 72

INDEX OF APPENDICES .................................................................. 73

5

## TABLE OF AUTHORITIES

**Cases**                                                                                 **Page**

*A-TAP, Inc. v. Tex. HHS Comm'n,*
2025 Tex. App. LEXIS 2553
(Tex. App.—Austin [15th Dist.] 2025, no pet.) ................................. 48

*Bluefield Water Works & Imp. Co. v.*
*Pub. Serv. Comm'n of the State of W. Va.,*
262 U.S. 679 (1923) ......................................................................... 44

*Burns v. City of San Antonio,*
2025 Tex. App. LEXIS 2267
(Tex. App.—Austin [15th Dist.] 2025, no pet.) ................................. 66

*City of El Paso v. Pub. Util. Comm'n of Tex.,*
883 S.W.2d 179 (Tex. 1994) ...................................................... *passim*

*City of Frisco v. Tex. Water Rights Comm'n,*
579 S.W.2d 66 (Tex. App.—Austin 1979, writ ref'd n.r.e.) ................ 52

*City of League City v. Tex. Water Comm'n,*
777 S.W.2d 802 (Tex. App.—Austin 1989, no writ) .......................... 23

*El Paso Hosp. Dist. v. Tex. HHS Comm'n,*
247 S.W.3d 709 (Tex. 2008) ...................................................... 51, 54

*Fed. Power Comm'n v. Hope Nat. Gas Co.,*
320 U.S. 591 (1944) ......................................................................... 44

*Pub. Util. Comm'n of Tex. v.*
*City Pub. Serv. Bd. of San Antonio,*
53 S.W.3d 310 (Tex. 2001) ............................................................... 14

*Railroad Comm'n v. Torch Operating Co.,*
912 S.W.2d 790 (Tex. 1995) ............................................................. 23

*Reliant Energy, Inc. v. Pub. Util. Comm'n of Tex.,*
153 S.W.3d 174 (Tex. App.—Austin 2004) ....................................... 23

*San Antonio Indep. Sch. Dist. v. City of San Antonio,*
    550 S.W.2d 262 (Tex. 1976) .................................................. 38, 44, 45

*State v. Pub. Util. Comm'n of Tex.,*
    883 S.W.2d 190 (Tex. 1994) ................................................ 35, 43, 44

*Suburban Util. Corp. v. Pub. Util. Comm'n of Tex.,*
    652 S.W.2d 358 (Tex.1983) .......................................................... 44

*Tex. Dep't of Pub. Safety v. Valdez,*
    956 S.W.2d 767 (Tex. App.—San Antonio 1997, no pet.) .................. 24

*Tex. Mun. Power Agency v. Pub. Util. Comm'n of Texas,*
    253 S.W.3d 184 (Tex. 2007) ..................................................... 56, 65

*Tex. State Bd. Of Pharm. v. Witcher,*
    447 S.W.3d 520 (Tex. App.—Austin 2014, pet. denied) ............... 50, 51

*Texas Dep't of Ins. v. State Farm Lloyds,*
    260 S.W.3d 233 (Tex. App.—Austin 2008, no pet.) ........................... 47

## Statutes

PURA[1] § 15.001 ......................................................................... 22, 24

PURA § 31.001 ................................................................................. 25

PURA § 33.008 ................................................................................. 41

PURA § 35.004 .......................................................................... *passim*

PURA § 36.157 ........................................................................... 46, 66

PURA § 40.004 ................................................................................. 65

Tex. Gov't Code § 1502.059 ....................................................... *passim*

Tex. Gov't Code § 2001.174 ................................................... 22, 24, 49

---

[1] Citation references to PURA throughout this brief refer to the Texas Utilities Code.

7

Tex. Loc. Gov't Code § 552.001 ...................................................... 15, 25

Tex. Transp. Code §§ 311.001, 311.002 ................................................ 41

**<u>Rules and Regulations</u>**

Tex. R. Evid. 201 .................................................................................. 28

16 Tex. Admin. Code § 25.192 .............................................................. 27

16 Tex. Admin. Code § 25.231 .............................................................. 49

16 Tex. Admin. Code § 25.247 .............................................................. 67

## GLOSSARY OF TERMS

| ALJs | Administrative Law Judges Linda Brite and Daniel Wiseman |
|------|-----------------------------------------------------------|
| Amended Application | Amended Application of Denton Municipal Electric to Change Rates for Wholesale Transmission Service, PUC Docket No. 52715, December 1, 2022 |
| Application | Application of Denton Municipal Electric to Change Rates for Wholesale Transmission Service, PUC Docket No. 52715, November 1, 2021 |
| AR | Administrative Record |
| City | City of Denton |
| Commission or PUC | Public Utility Commission of Texas |
| DME | Denton Municipal Electric |
| DSCR | Debt Service Coverage Ratio |
| ERCOT | Electric Reliability Council of Texas |
| Final Judgment | Judgment of District Court in Cause No. D-1-GN-23-008974 on January 16, 2025, on judicial review of PUC Docket No. 52715. |
| Final Order | Order in PUC Docket No. 52715, October 12, 2023 |
| GFT | General Fund Transfer |
| IOU | Investor-Owned Utility |

| | |
|---|---|
| MOU | Municipally Owned Utility |
| OPUC | Office of Public Utility Counsel |
| PFD | Proposal for Decision |
| PURA | Public Utility Regulatory Act, codified as Texas Utilities Code Section 11.01, *et seq.* |
| RFP | Rate Filing Package |
| SOAH | State Office of Administrative Hearings |
| TCOS | Transmission Cost of Service |
| TIEC | Texas Industrial Energy Consumers |
| TSP | Transmission Service Provider |

## STATEMENT OF THE CASE

*Nature of the Case:* This is a case brought by the City of Denton ("City") through its municipally owned utility ("MOU"), Denton Municipal Electric ("DME"), seeking partial review of the Final Judgment of the District Court for the 459th Judicial District, Travis County, Texas issued pursuant to that court's judicial review of the Public Utility Commission of Texas's (the "Commission" or "PUC") October 12, 2023 Final Order setting a wholesale transmission rate and ancillary rulings for DME. Specifically, the City appeals the failure of the Final Judgment to reverse the Commission's decision 1) to limit DME's General Fund Transfer ("GFT") to the City by barring the Return on Investment component of the General Fund Transfer and 2) to require DME to file an interim rate proceeding only 90 days after the Final Order on the basis that those elements of the Final Order are not supported by substantial evidence, and are arbitrary, capricious, or characterized by an abuse of discretion.

*Trial Court:* District Court for the 459th Judicial District, Travis County, Texas.

*Course of Proceedings:* On December 14, 2023, Appellant timely sought judicial review of the Commission's Final Order (App. B, RR at Ex. 1, AR 159) after exhausting all administrative remedies through the Commission as set forth in Chapter 2001, Subchapter G of the Texas Government Code. (CR 3–55.) The parties briefed the issues and the district held a hearing on the merits on November 13, 2024. (*See* CR 60.)

*Disposition in Trial Court:* The district court entered Final Judgment reversing in part and affirming in part the Commission's action on January 16, 2025. (App. A, CR 60–61.) By its Final Judgment, the district court 1) reversed and remanded

11

the Commission's Final Order provision limiting DME's debt service coverage ratio in its wholesale transmission rate to 1.25x, and 2) denied all other relief requested.

## INTRODUCTION

This case presents a situation where the Commission reached an extra-legal and incorrect conclusion before the process even began, driving it to disregard multiple boundaries and limits on its authority in its zeal to "punish" DME for "misconduct" that was no misconduct at all. And like any journey, once the Commission embarked by heading off in an entirely wrong direction, each step in that direction took it further from its proper destination instead of closer. This appeal is the mechanism to remedy that ill-fated journey the only way it can be remedied: by returning the matter and the parties to the first principles that govern and limit agency action in Texas.

The Legislature created the Commission in 1975 to regulate electric utilities. The Commission has broad jurisdiction over all types of rates and services for Investor-Owned Utilities ("IOU"), including distribution retail rates and wholesale transmission rates. In contrast, with respect to MOUs like DME, the Commission has limited authority to set rates only for that entity's wholesale transmission service.

This appeal, like the underlying judicial-review action, does not challenge the Final Order in its entirety. There are layered and complex

13

considerations that go into setting wholesale Transmission Cost of Service ("TCOS") rates. The Commission's Final Order is 14 pages, with 61 "Findings of Fact" and 18 "Conclusions of Law" (not counting discrete subparts), culminating in 10 ordering paragraphs. (*See* RR at Ex. 1, AR 159.) DME sought rehearing and then review of three specific and clear instances where the Commission overstepped and exceeded the boundaries set by state law and the Commission's own regulations.

As a statutorily created body, the PUC has no inherent authority and instead has only the authority that the Legislature confers upon it "clearly and explicitly." *Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 315 (Tex. 2001). Likewise, as a governmental body, the PUC is subject to numerous elements of State law, including the Texas Open Meetings Act. Tex. Gov't Code § 551.001, *et seq*. Before the Commission, DME moved for rehearing only as to three points of error in the Commission's Final Order: (1) improper restriction of DME's debt service coverage ratio ("DSCR") to 1.25x,[2] (2) improperly limiting DME's general fund transfer ("GFT") by barring completely the return-on-

---

[2] Denton's appeal before this Court does not include this issue, as the district court's Final Judgment appropriately reversed and remanded that issue below. (CR 60–61.)

14

investment component of that transfer, and (3) ordering DME to file an interim rate proceeding upon conclusion of the primary TCOS case. (*See generally* RR at Ex. 1, AR 162.) DME's points of error as to the Final Order that were the subject of the judicial-review action below but were not cured by the Final Judgment on review, are now before this Court and demonstrate the Commission acted outside of the bounds of its authority.

The Final Order reveals the Commission's unilateral and unauthorized movement toward limiting municipalities' proprietary right to operate MOUs. *See* Tex. Loc. Gov't Code § 552.001. While Chapter 35 of PURA provides for certain *limited* oversight of MOUs by the Commission, the Findings and Conclusions in the Final Order go well beyond the bounds of the oversight authority found in Chapter 35.

Specifically, limits to the GFT and DSCR[3] in the Final Order and ordering an interim rate proceeding to place DME on a schedule not prescribed by law are part of a movement to corral MOUs to new standards

---

[3] The Commission's Final Order limited the DSCR component of DME's TCOS rate to 1.25x. (CR 26.) Based on a record that reflected that the Commission based its order limiting the DSCR on guidance contained in a "rate filing package" that the Commission "adopted" on an *ad hoc* basis, in clear violation of the Texas Open Meetings Act as well as other law, the district court correctly reversed and remanded that element of the Final Order by its Final Judgment. (CR 60–61.) DME does not appeal that portion of the Final Judgment, although it understands that the Commission intends to do so.

the Commission thinks should apply. However, those standards—if any are to be imposed at some point—are for the Legislature to pronounce and impose, not the Commission. The Commission's decision-making in that respect therefore is in error, and the Court should reverse and remand for further proceedings.

Why did the Commission disregard the limits on its authority and stray from longstanding first principles governing agency conduct? The record and unabashed statements of the Commission make it clear that the entire process, and the elements of the Final Order that were appealed by DME, were irrevocably tainted because the Commission *admittedly* based its decisions on its legally and factually inaccurate (and impermissibly considered) casting of DME as a "bad actor" that had "overearned" in the past.

The Commission's and OPUC's Response Briefs in the judicial review proceeding articulate the basis for their positions and the core justification for all of the Commission's actions in unambiguous terms: DME deserves a lower rate of return in its TCOS rate *today* because of the regulatory delay (that those parties caused) during the lower proceedings and (importantly) because DME's requested revenue requirement today is lower than it was

authorized to recover under its *prior* Commission-approved TCOS rate. (Supp. CR 278–79, 307–08.) That foundational premise is nonsensical, and it understandably yielded a result that was nonsensical. To be clear:

- For as long as the Commission has had authority over TCOS rates, DME has *always and only* charged a TCOS rate pursuant to express Commission order and approval (RR at Ex. 1, AR 183 at 9:15–10:7); thus

- DME has *never* charged a penny more in its TCOS rate than it was expressly authorized to by a valid Commission order.

  But, in spite of DME's consistent record of compliance:

- The Commission decided that, because DME's prior, *Commission-authorized* TCOS rate was higher than it thought DME's next Commission-authorized TCOS rate should be, DME had "overearned," and the next rate (the one at issue in this proceeding) should be artificially low to make up for that "overearning," (Supp. CR 278–79, 307); even though

- No statute, rule, or caselaw provides such a definition of "overearning," nor does any mechanism or guiding principle exist in any such source to allow the Commission to weigh and craft a remedy for such made-up "overearning."

The Commission created and then admittedly applied an arbitrary and legally non-existent definition of the term "overearning" to justify lowering DME's authorized rate of return. Fundamentally, the Commission decided to put its finger on the scale in this new TCOS proceeding to "even things out."

17

The record does not support—and the law does not allow—the Commission's findings and conclusions driven to penalize DME for the invalidly alleged "wrongful conduct" of . . . following the Commission's prior Order and exercising its legal rights in a contested case. Once the Commission decided to do something for the wrong reason—a reason which, being extra-legal, obviously contains no legal guiding principles—the entire process went awry, and the outcome was destined to be far afield from the actual principles that govern the Commission and the subject matter.

Upon review, the district court rightly reversed one of the points of error DME raised. DME is asking this Court to fully cure and redress the remaining arbitrary overreach by the Commission in its Final Order limiting DME's GFT and ordering DME to immediately file an interim rate proceeding.

## STATEMENT REGARDING ORAL ARGUMENT

This case involves the interplay between the statutory and regulatory frameworks that govern the Public Utility Commission and municipally owned utilities, specifically relating to rates for wholesale transmission services, in the State of Texas. The City of Denton believes that oral argument will facilitate the disposition of this dispute.

## ISSUES PRESENTED FOR REVIEW

1.  Texas Government Code Section 1502.059 authorizes a municipally owned utility to make a transfer of a percentage of its revenue earned through rates to the municipality's general fund for any "general or specific purpose" in the amount authorized by municipal ordinance. This transfer is referred to as the "General Fund Transfer." The City of Denton included a GFT in its TCOS Application that totaled 11% of revenues. The GFT was composed of a 5% franchise fee component and a 6% return-on-investment component. The 6% return-on-investment component was set by an ordinance adopted by the City of Denton, pursuant to Government Code Section 1502.059. The Commission's Final Order provides only for a GFT restricted to the 5% franchise-fee component, excluding the return-on-investment component in its entirety.

   ***Issue Presented:*** Did the Commission err by excluding entirely the return-on-investment component from the General Fund Transfer that was included in the City of Denton's Transmission Cost of Service?

2.  In its Final Order, the Commission directed Denton Municipal Electric to file an interim TCOS application within 90 days. In its conclusions of law, the Commission cited to its general "reasonableness" oversight authority but cited no explicit statutory authority in Chapters 35

or 40 of Public Utility Regulatory Act[4] ("PURA") to order an entity to file an interim rate proceeding, which chapters contain the sole grant to the Commission of its limited regulatory power over the transmission rates of municipally owned utilities, as no such explicit authority exists. In contrast, other provisions of the Public Utility Regulatory Act relating to investor-owned utilities expressly grant the Commission authority to order a utility to file a rate proceeding.

> ***Issue Presented:***   Did the Commission err and exceed its statutory authority in ordering Denton Municipal Electric to file an interim Transmission Cost of Service proceeding within 90 days of the issuance of the Final Order?

---

[4] The Public Utility Regulatory Act is codified as Texas Utilities Code § 11.01, *et seq*. References to the Texas Utilities Code will be cited as PURA for the relevant statutory provisions throughout this brief.

## STANDARD OF REVIEW

This appeal challenges certain findings and orders in the Commission's Final Order related to (1) DME's GFT, and (2) interim rate proceedings following a contested hearing. Per PURA, the Court reviews the Commission's decision under the substantial-evidence standard. PURA § 15.001. The full standard for judicial review of agency decisions authorized by Section 15.001 of PURA provides that the Court:

> (2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> > (A) in violation of a constitutional or statutory provision;
> >
> > (B) in excess of the agency's statutory authority;
> >
> > (C) made through unlawful procedure;
> >
> > (D) affected by other error of law;
> >
> > (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
> >
> > (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174.

The test under the substantial-evidence standard is "not whether the agency reached the correct conclusion, but whether some reasonable basis

exists in the record for the action taken by the agency." *City of League City v. Tex. Water Comm'n*, 777 S.W.2d 802, 805 (Tex. App.—Austin 1989, no writ). "The agency's action will be sustained if the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its actions." *Id.*

An agency action may be deemed arbitrary or an abuse of discretion if the agency "(1) failed to consider a factor the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result." *City of El Paso v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 179, 184 (Tex. 1994). An agency's decision may also be deemed arbitrary if "it fails to follow the clear, unambiguous language of its own regulations." *Reliant Energy, Inc. v. Pub. Util. Comm'n of Tex.,* 153 S.W.3d 174, 199 (Tex. App.—Austin 2004). Finally, and importantly, an agency decision that violates a statute or exceeds the agency's statutory authority must be reversed. *Railroad Comm'n v. Torch Operating Co.*, 912 S.W.2d 790, 792 (Tex. 1995) ("We must reverse an administrative agency's decision if it violates a constitutional or statutory provision or exceeds the agency's statutory authority.").

Appellant sought judicial review of the Commission's administrative decision pursuant to Section 15.001 of PURA. The district court heard and decided the matter in accordance with its jurisdiction under the Administrative Procedure Act ("APA"), codified in Chapter 2001 of the Texas Government Code. Decisions of the trial court under the APA are reviewed de novo. *See Tex. Dep't of Pub. Safety v. Valdez*, 956 S.W.2d 767, 769 (Tex. App.—San Antonio 1997, no pet.) (explaining that the court of appeals reviews trial court decisions involving questions of law de novo and "[e]ach of the grounds for reversal listed in section 2001.174(2), including substantial evidence review, presents a question of law.").

## STATEMENT OF FACTS

**A.** **The Public Utility Regulatory Act and the Public Utility Commission of Texas established.**

The relevant facts of this case necessarily include the regulatory history of municipally owned utilities, including how the Commission is empowered (and not empowered) to regulate their rates, as well as a brief discussion of the powers granted exclusively to municipalities.

In 1975, the Texas Legislature enacted PURA to establish a comprehensive and adequate regulatory system for electric utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the electric utilities. PURA § 31.001(a). PURA also created the Public Utility Commission of Texas to regulate electric utilities. The Commission has enacted substantive rules to effectuate the statutory provisions of PURA. 16 Tex. Admin. Code § 25.1, *et seq.*

**B.** **The City of Denton operates its municipally owned utility, Denton Municipal Electric.**

Municipalities have a proprietary right to own their own utilities. Tex. Loc. Gov't Code § 552.001. The City owns electric transmission and distribution facilities to provide retail electric service to over 65,000 customers in its service area.

The City also owns and operates an electric generation facility known as the Denton Energy Center ("DEC"). The City buys electricity from the Electric Reliability Council of Texas ("ERCOT") wholesale transmission market, and sells energy from the DEC and from Power Purchase Agreements in the ERCOT wholesale transmission market. Notably, neither of those activities (distribution of electricity to retail customers in its service area and power purchases/sales of electricity by the City in the ERCOT market) are at issue in this proceeding. Instead, this matter relates solely to the rate DME charges for access to and use of the electric transmission assets and infrastructure that it owns and operates within ERCOT.

## C. The Commission's authority over wholesale transmission rates.

PURA authorizes the PUC to set rates for electric utilities—and in certain limited and discrete instances—MOUs, with the objective of providing electric utilities and MOUs an opportunity to earn a reasonable rate of return on their invested capital and recover reasonably incurred expenses.

An MOU is outside of the Commission's jurisdiction over retail electric distribution rates—that is, the rates for home and business owners

receiving electric service within the MOU's service territory. However, Chapter 35 of PURA gives the Commission jurisdiction for the limited purpose of establishing an MOU's rates for wholesale transmission service within the ERCOT market. PURA § 35.004.

The wholesale transmission market is sometimes referred to as "the grid" and is a network of interconnected transmission lines that deliver electricity across ERCOT. Transmission owners must file an application with the Commission in a TCOS proceeding so that the Commission can establish just and reasonable rates for the use of their transmission system. 16 Tex. Admin. Code § 25.192(c). As the owner of transmission infrastructure that transmits electricity in and through the ERCOT system, the City's rate for wholesale transmission service provided via that infrastructure is subject to such rate-setting. The Commission-approved rates are then paid by other users of the transmission system.

Conversely, Chapter 36 of PURA gives the Commission very broad and extensive jurisdiction over distribution retail rates for IOUs. Chapter 36 of PURA does not apply to MOUs, and the City's retail rates are not at issue in its TCOS application or in this proceeding.

**D. DME filed an Application to change its wholesale transmission rates.**

Responding to an order of the Commission,[5] on November 1, 2021, DME filed an Application to Change Rates for Wholesale Transmission Service ("Application") pursuant to 16 Texas Administrative Code Section 25.192(c) in PUC Docket No. 52715.[6]

The Office of Public Utility Counsel ("OPUC") and Texas Industrial Energy Consumers ("TIEC") filed motions to intervene and were granted party status in that docket. (RR at Ex. 1, AR 10, AR 15, AR 42, AR 44.)

---

[5]  DME did not, and does not, concede that the PUC has the statutory authority to require an MOU to submit a comprehensive TCOS filing. Nonetheless, to avoid creating conflict, DME complied with the "order" and submitted the filing the Commission ordered. That issue is not one of the points of error at issue in this appeal.

[6]  From 2005 to 2023, when a new TCOS rate was set in this PUC Docket No. 52715, DME charged only TCOS rates that were set by the Commission. Tex. Pub. Util. Comm'n, *Application of Denton Municipal Electric to Change Rates for Wholesale Transmission Service*, Docket No. 30358 (final order) (Jun. 15, 2005). Importantly, DME has never charged a TCOS rate that was outside of or in excess of the rate allowed and ordered by Commission orders (*see* Final Orders for DME's Applications for Interim Transmission Cost of Service in PUC Docket Nos. 30358, 38815, 42770, 45071, 46348, 47900, 48963, 50110, 51345, 52449). The Public Utility Commission filings are public records available online at https://interchange.puc.texas.gov/. Denton asks the Court to take judicial notice of the dockets cited (along with the filings therein). *See* Tex. R. Evid. 201. DME has an unblemished record of TCOS rate compliance; there has never been any enforcement proceeding or similar proceeding finding—or even alleging—that DME has ever charged a TCOS rate in excess of the rate allowed by a valid order of the Commission.

The Commission referred the case to the State Office of Administrative Hearings ("SOAH") on August 3, 2022, and issued a Preliminary Order the next day, identifying 34 issues to be addressed in the SOAH proceeding. (RR at Ex. 1, AR 61.)

DME filed an Amended Application on December 1, 2022.[7] (RR at Ex. 1, AR 90.) The Amended Application was declared administratively complete on May 23, 2023. (RR at Ex. 1, AR 129.)

A hearing on the merits was held on May 11, 2023, by videoconference before SOAH Administrative Law Judges ("ALJs") Linda Brite and Daniel Wiseman. (RR at Ex. 1, AR 168.) DME, OPUC, TIEC, and Commission

---

[7] The day before DME filed its Amended Application at the Commission (on November 30, 2022), DME filed a parallel interlocutory challenge in Travis County District Court in connection with PUC Docket No. 52715 and the Commission's order regarding interim rates. During the administrative proceedings for Docket No. 52715, Intervenors OPUC and TIEC, along with Commission Staff, requested the imposition of interim rates to address perceived "overearning" during the pendency of the application process. The SOAH ALJs ordered interim rates and the Commissioners ordered an evidentiary hearing to set interim rates. DME disputed the PUC's authority to set interim rates under Chapter 35 of PURA in connection with its TCOS Application by filing a petition for declaratory judgment and application for temporary and permanent injunction in the district court in Travis County, *City of Denton v. Lake, et al.*, Cause No. D-1-GN-22-006855. The district court granted a writ of temporary injunction, staying the imposition of interim rates pending a trial on the merits. On April 19, 2023, the district court granted a permanent injunction against the PUC Commissioners, prohibiting them from setting interim rates in connection with DME's TCOS Application. (App. M, Final Judgment and Permanent Injunction, *Denton v. Lake, et al.*, Cause No. D-1-GN-22-006855 (200th District Court, Travis County, Texas) (Apr. 19, 2023).)

Staff participated in the hearing. The parties filed post-hearing briefs on May 26, 2023, and reply briefs and proposed findings of fact, conclusions of law, and ordering paragraphs on June 9, 2023, at which time the record closed. (RR at Ex. 1, AR 130–41.)

On August 8, 2023, the ALJs issued a Proposal for Decision ("PFD") that would effectively render DME's ability to receive just and reasonable TCOS rates null. (RR at Ex. 1, AR 146.) Although there were a number of findings and recommendations, included in the PFD were determinations that: (1) DME's 6% Return on Investment ("ROI") was disallowed as a component of the GFT because there was no cost rationale related to the actual provision of transmission service and by that component DME sought to recover a return on investment and additional payment to the City; (2) only a 1.25x DSCR was appropriate; and (3) because the application was filed over a year and a half before the timeframe of the PFD, DME should file an interim TCOS proceeding within 90 days from the Final Order. (RR at Ex. 1, AR 146.)

The Commission considered the PFD at an open meeting on September 28, 2023, and issued a Final Order largely consistent with the PFD. (RR at Ex. 1, AR 159.) The Final Order was entered on October 12,

2023. (RR at Ex. 1, AR 159.) The City timely filed a Motion for Rehearing on November 3, 2023, which was overruled by operation of law on November 15, 2023. (RR at Ex. 1, AR 163.)

**E.    DME sought judicial review.**

The City timely filed a petition in the 459th Travis County District Court on December 14, 2023. (CR 3–55.) DME sought judicial review of the following points of error in the Final Order: the Commission (1) improperly restricted DME's DSCR component of its TCOS rate to 1.25x, (2) improperly limited DME's GFT by disallowing the ROI component in its entirety because that component was not "directly tied" to the provision of transmission service, and (3) improperly ordered DME to file an interim rate proceeding. (CR 9–14.) No other party filed a petition or raised any points of appeal at the District Court. On November 13, 2024, a hearing on the merits was held in the judicial review of the Commission's Final Order. (CR 60.) On January 16, 2025, the Honorable Judge Guerra Gamble issued a Final Judgment reversing and remanding the Commission's Final Order provision limiting DME's debt service coverage ratio to 1.25x and denying all other relief not granted in the Final Judgment. (CR 60–61.) Thus, the District Court granted DME's appeal as to the portion of the Commission's

Final Order improperly limiting DME's DSC, but denied DME's appeal as to the Commission's decision to limit its GFT and to order DME to file an interim rate proceeding.

DME now appeals the District Court's Final Judgment to the extent that it denied DME's administrative appeal of the portion of the Commission's Final Order limiting DME's GFT and the portion of the Commission's Final Order ordering DME to file an interim rate proceeding.

## SUMMARY OF THE ARGUMENT

The erroneous portions of the Commission's Final Order, if not corrected by this Court, would create sweeping, unsubstantiated changes to MOU ratemaking policies and precedent by imposing new standards that have no basis in the law.

Administrative agencies must act within the bounds of the authority granted to them by the Legislature. The law does not just build pathways for regulatory agencies; it also erects fences, and each agency is obligated to stay within its permitted area. The PUC jumped the fence at the very beginning of this case, applying arbitrary and extra-legal irrelevant factors in sharply limiting DME's TCOS rate, and exercising a power that was not granted to it in ordering DME to file an interim rate proceeding. The district court correctly found that the Commission was out-of-bounds on the debt service coverage ratio issue; this Court should continue that process of review and hold that the Commission—regardless of how well-intentioned it may have believed its actions were—was also out-of-bounds on the remaining two issues.

As important as what the Commission did was *why* the Commission did it: the Commission set DME's TCOS rate artificially low for an

impermissible reason, not grounded in any law or fact: a desire to even out DME's past "overearning," even though DME has always and only charged a TCOS rate in full compliance with valid Commission orders. With inflammatory claims that DME was "overearning" and even "improperly" delaying the administrative proceeding, the Intervenors and Commission Staff have incorrectly villainized DME in an effort to justify the Commission's zeal in "correcting" purported statutory gaps left by the Legislature. That reason is not in doubt; the record and the Commission's own briefing boldly state that DME's "overearning" was the key motivation and justification for the final rate the Commission set. The Commission created a new extra-legal standard and then, applying it to actions of DME that pre-dated any such "standard," decided DME ran afoul of that standard. Considering a standard that does not exist under any law or rule and applying it *ex post facto* fall squarely within the definition of "arbitrary," and any action even partially based on enforcing that standard must be reversed.

A process that begins on the wrong path will often continue even further down that path, inevitably straying further and further from the guiding law and principles. In this case, as a result of the Commission's

34

improper quest to remedy DME's "overearning" at the outset, the Final Order in DME's TCOS proceeding violated one of the foundational legal standards in utility ratemaking: a regulated utility must be allowed a reasonable opportunity to recover its operating expenses together with a reasonable return on its invested capital. *State v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 190, 197 (Tex. 1994).

An MOU needs sufficient return dollars over and above its actual operating expenses to meet its cash needs. (Supp. CR 281.) However, the Commission stripped DME of the opportunity to earn a reasonable rate of return by improperly limiting its DSCR *and* excluding the ROI component of its GFT. The Commission's actions on each point are reversible, but when taken together, hit DME with a "double whammy" that denies DME the ability to receive sufficient return dollars to meet its cash needs. Upon judicial review, the trial court correctly found that the Commission's decision to limit DME's DSCR to 1.25x was arbitrary and capricious. However, the Commission's decision to also arbitrarily limit the GFT DME could include in rates based solely on a fabricated standard still prevents DME from the opportunity to earn a reasonable rate of return.

And while the record reflects that "overearning" *was* a key justification and motivation for the final rate set, there is no discussion or calculation of how that overearning (and the forward-looking rate action to even it out) was accounted for. And how could there be? It logically follows that a hastily made-up standard will not contain any guiding principles, elements, or other guidance for its application. It further follows that DME had no hope of avoiding running afoul of such a standard, being that it never existed before and was only created and then applied to DME *ex post facto*.

In furtherance of their quest to reduce DME's rate recovery today to make up for its perceived over-recovery in the past, the Commission and OPUC attempted to validate the discriminatory decision to limit and reduce DME's GFT from 11% to 5% by relying on an improper creation of an additional extra-legal criterion. The Commission argued that a GFT must be "directly tied" to transmission costs, but cited no authority in rule or statute where this standard is established—because there is none. The law allows a municipality to own its utility and receive a profit from that ownership, and to make a transfer of rate revenues to its general fund for *any* general or specific purpose. The Commission has unlawfully denied inclusion of a material component of DME's GFT in DME's TCOS rate,

causing DME to charge a rate that does not recover all of its required expenses. DME's total GFT is reasonable and should have been approved.

Finally, the Final Order's edict to DME to return within 90 days of the Final Order and file an interim rate proceeding was the final extra-statutory action in a campaign by the Commission to assert oversight authority over MOUs that is not authorized by Chapter 35 of PURA. Chapter 35 of PURA does not grant the Commission the power to order an MOU to file an interim rate proceeding. The Legislature *could* have granted that power to the Commission in Chapter 35; the Legislature granted the Commission that exact power over IOUs in Chapter 36 of PURA. What the Legislature chooses *not* to say has equal legal importance as what the Legislature chooses *to* say. The Legislature's decision not to grant that power to the Commission in Chapter 35 must be given effect.

For these reasons, the Final Order, which suffers from an incurable fatal flaw from its inception, and then goes on to incorporate other similarly fatal flaws, should be reversed and remanded for further proceedings consistent with the law and the record.

## ARGUMENT & AUTHORITIES

**A.      The Commission unlawfully denied inclusion of DME's 6% ROI component of its GFT in TCOS Rates.**

Bad motives often make for bad law, and this case is no exception. The Commission disregarded core legal principles and an exclusive grant of statutory authority to the City in reaching its arbitrary and capricious decision to slash DME's GFT. And no wonder; the Commission started from a foundational point of deciding DME was a bad actor (a conclusion not based on *any* applicable law or legal principles, as DME has *never* charged a transmission rate greater than allowed by Commission order), and once it did so, every Commission decision at issue herein 1) was irrevocably tainted by that conclusion and 2) was made for the purpose of punishing DME for its past imagined malfeasance.

In this case, the Final Order robbed DME's right to earn a reasonable rate of return. *See San Antonio Indep. Sch. Dist. v. City of San Antonio*, 550 S.W.2d 262, 264 (Tex. 1976). The arbitrary and discriminatory limit the Commission placed on DME's GFT set an unreasonably low rate of return that prevents DME from operating its utility to (1) recover all costs and (2) make a reasonable profit.

In its TCOS Application, the City included a GFT totaling 11% of revenues, comprised of a franchise-fee component, which equals 5% of revenues, and a Return-on-Investment ("ROI") component, which equals 6% of revenues. The Final Order limiting recovery of DME's GFT to solely the 5% franchise-fee component is contrary both to State law and the Commission's historic treatment of MOUs. The Commission does not have the authority to limit an MOU's GFT based on an *ad hoc* standard not based in law or evidence. DME's GFT was properly authorized by the City of Denton based on the City's exclusive statutory authority. Accordingly, the Commission's decision to exclude DME's ROI component of GFT is arbitrary and capricious and unsupported by the substantial evidence introduced at the administrative level.

### 1. *GFT as part of the TCOS ratemaking picture.*

A general fund transfer, or GFT, is the transfer of funds from an MOU to the general fund of the municipality. Tex. Gov't Code § 1502.059.

> TRANSFER OF REVENUE TO GENERAL FUND. Notwithstanding Section 1502.058(a) or a similar law or municipal charter provision, a municipality and its officers and utility trustees may transfer to the municipality's general fund and may use for general or special purposes revenue of any municipally owned utility system in the amount and to the extent authorized in the indenture, deed of trust, or ordinance

39

providing for and securing payment of public securities issued under this chapter or similar law.

Tex. Gov't Code § 1502.059.

Under that law, MOUs are expressly authorized to make GFTs from rate revenues according to the terms set by the corresponding municipality. *Id.* The municipality has broad discretion to use the funds transferred for general or special purposes. *Id.* The authorizing statute leaves the amount and extent of the transfer to the municipality's sole discretion as codified or recorded in a municipal ordinance, deed of trust, or indenture. *Id.* In plain terms, the statute provides for a municipality—and only a municipality—to set the amount of its GFT by ordinance.

The City's authorized GFT from DME contemplates two components—a percentage attributable to franchise-fee payments for use of city rights-of-way and a percentage for return on investment, which serves as a dividend to the customer base (the citizens of Denton) for the risks associated with debt and ownership of the publicly owned utility. (*See* RR at Ex. 1, AR 183 at 13:2–14:2.)

### a. *Role of franchise fee.*

The franchise-fee component is intended to compensate the City for DME's use of the public rights-of-way in the same manner that any other

40

utility or company operating within the City's rights-of-way would. (RR at Ex. 1, AR 183 at 13:21–14:2.) This component is not unique to MOUs. Cities in Texas possess a statutory right to charge electric utilities for the right to use their rights-of-way. PURA § 33.008; Tex. Transp. Code §§ 311.001, 311.002. IOUs, MOUs, and electric cooperatives are all routinely charged franchise fees by cities exercising this statutory right.

Any utility operating in Denton's city limits owes the city a franchise fee. Thus, the franchise-fee component is merely a standard service charge owed to the City for operating within its rights-of-way. A franchise fee is not a return for the risks of utility ownership. In granting an allowed rate of return for an IOU, the Commission has historically treated franchise fees as an expense and allowed the IOU to separately earn a return on equity.[8] The Commission's decision in this case erroneously treats the franchise fee component as if it is a return on equity rather than a true cost of doing business. If DME's GFT is limited to only the franchise-fee component,

---

[8]    IOUs treat municipal franchise fees as "Taxes Other than Federal Income Tax." This treatment excludes these amounts from rate base and the utility treats them as an expense in the overall cost of service. Because they are excluded from rate base, the utility does not earn a return on these costs. *See e.g.*, Tex. Pub. Util. Comm'n, *Application of CenterPoint Energy Houston Electric, LLC for Authority to Change Rates*, Docket No. 56211, at pp. 855–58, (Mar. 6, 2024) (application), available at https://interchange.puc.texas.gov/Documents/56211_3_1372769.PDF.

DME is effectively only recovering (most of its) costs and Denton's citizens see *no* benefit for the burden and risk of owning a utility.

### b.    *Role of ROI.*

The ROI component of DME's GFT is akin to the dividends an IOU pays to its shareholders, or the capital credits that an electric cooperative returns to its member customers.  (RR at Ex. 1, AR 183 at 13:8–17.)  The ROI component is additionally comparable to the compensation Denton receives for ad valorem taxes and other taxes and/or fees paid to the City by IOUs and cooperatives that own similar infrastructure within the City.  Thus, the ROI component of DME's GFT also accounts for costs DME would have to pay to the City as a stand-alone utility if not for the fact that it is a business unit of the City.  (RR at Ex. 1, AR 176 at 55:14–17.)

While DME as a non-IOU does not have "investors," Denton's citizens bear the risk of operating an electric utility; the ROI component of the GFT is a proxy for the risk-based return on equity IOUs pay out to the shareholders in dividends.  (RR at Ex. 1, AR 183 at 13:10–17.)  In 2022, the City, via ordinance, formally approved an ROI payment for the Electric Fund equal to 6% of gross revenues.  (RR at Ex. 1, AR 182.a at 198–99.)  Prior to formalizing the ROI in 2022, Denton had already temporarily

increased the earlier 3.5% ROI transfer to 6% in a 2020 ordinance. (RR at

Ex. 1, AR 208 at 31–32.) In addition, the ROI component is specifically

provided for in Section 12.03 of the City's Charter, which requires a return

computed "on the net investment in the utility system" after the utility

meets the requirements of various funds. (RR at Ex. 1, AR 176 at 56:1–11;

App. N.) The City's exercise of its Section 1502.059 GFT authority thus

came about via ordinance (as provided by the statute) and is entirely

consistent with its Charter.

### 2. Disallowing DME's 6% ROI violates longstanding law by leaving DME with insufficient return dollars.

By the Commission's own definition, an MOU needs "sufficient

return dollars over and above its actual operating expenses to meet its

cash needs." (Supp. CR 281.) The Commission's decision to exclude

completely the ROI component of the GFT deprives DME of its rightful

opportunity to earn sufficient return dollars.

A utility's rate of return is one of, if not *the*, most substantive pieces

of ratemaking. A regulated utility must be allowed a reasonable

opportunity to recover its operating expenses together with a reasonable

return on its invested capital. *State v. Pub. Util. Comm'n of Tex.*, 883

S.W.2d 190, 196–97 (Tex. 1994). "This requirement is met only if the

43

return is sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and attract capital." *Id.*, (citing *Suburban Util. Corp. v. Pub. Util. Comm'n of Tex.*, 652 S.W.2d 358, 362 (Tex.1983)); *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944); *Bluefield Water Works & Imp. Co. v. Pub. Serv. Comm'n of the State of W. Va.*, 262 U.S. 679, 692–93 (1923).

DME's 6% ROI is a proxy for the risk-based return on equity other utilities pay to shareholders. (RR at Ex. 1, AR 183 at 13:10–17.) The City's Charter requires that the City shall be entitled to receive an annual return on its net investment from excess revenues, if any, of the Electric System not more than 6% of the net investment as a "return on investment." (RR at Ex. 1, AR 176 at 56:1–11.) An MOU's "excess revenues" inherently come from rates. The Commission asserts that the 6% ROI is "additional compensation," but this argument is in direct conflict with Supreme Court precedent specifically providing that a city may receive a profit from its ownership of a utility. *San Antonio Indep. Sch. Dist. v. City of San Antonio*, 550 S.W.2d 262, 262 (Tex. 1977). The court in that case stated that "[a] city which owns and operates its own public utility does so in a proprietary capacity," and provided history

about how the statute permitting GFTs originally contemplated a transfer to cover only service and payments in lieu of ad valorem taxes, but that it was later amended to encompass more than just costs. *Id*. at 264. As confirmed by the Supreme Court, the Legislature envisioned cities benefitting from a reasonable amount of their excess revenues as compensation for utility ownership. If DME is prohibited from recovering a reasonable ROI in its TCOS, the Commission is denying the City its established right to earn a reasonable profit for its ownership of DME.

This unprecedented exclusion is even more egregious when considered in light of the Commission's companion arbitrary and capricious limitation of DME's DSCR in the Final Order, and when considering the Commission's *stated reason for limiting both*: to penalize DME for past "overearning." (*See e.g.,* Supp. CR 278–79 (Commission confirming that the purpose of the rate case was "to determine whether Denton was overearning")); Supp. CR 307–08 (Commission stating that "Denton's history of overearning" justified a lower DSCR for DME, and adopting the argument that "Denton would not be justified in receiving a DSC ratio above 1.25x" in light of "its prolonged overearning . . ."); *City of El Paso v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 179, 184 (Tex. 1994)

(an agency decision is arbitrary and capricious when it "considers an irrelevant factor").[9]

Instead of recognizing the codified right of the City to make a transfer to the City's general fund from utility proceeds, the Commission's decision creates a damaging inconsistency: MOU transmission providers should be treated the same as IOUs[10] *except* a municipality should not receive any benefit for utility ownership through

---

[9] "Overearning" is generally defined by law as "whether a utility has earned materially more than the utility's authorized rate of return on equity as demonstrated by earnings monitoring reports." PURA § 36.157. The concept of "overearning" as used in this proceeding is necessarily an irrelevant factor because the concept, as the Commission has applied it to DME, does not exist anywhere. For example, neither Chapter 35 of PURA nor any rule contain any grant of power, directive, or even concept along the lines of "if the Commission determines that an entity, by charging an earlier Commission-approved rate, earned more rate revenue in the past than the Commission would approve of today, the Commission may lower the entity's future rate to make up for the amount of rate revenue under the past rate that the Commission no longer approves of." (*See* CR 307 (Commission brief defining the term "overearning" as used in this case: "[t]he Commission uses the term overearning to mean the difference between the total transmission revenue requirement that Denton requested and the amount of Denton's current transmission revenue requirement.").) A concept that does not exist under the law, with no guiding principles at all, is necessarily an "irrelevant factor." *See City of El Paso*, 883 S.W.2d at 184. Further, to the extent that such extra-legal standard even could be created and applied, applying it to DME as a retroactive remedy would be patently arbitrary.

[10] In its brief below, the Commission itself said "[t]he statutory framework makes no distinction between investor-owned utilities and cities that provide electric service…with regard to setting wholesale transmission rates." (Supp. CR 288.) If that is the case, then why is an IOU allowed to use transmission rates to fund an ROI, while DME is prohibited from using transmission funds to make a reasonable transfer specifically permitted by statute? This discriminatory treatment is contrary to the law.

its TCOS rates.  This is facially discriminatory.  Even worse, the decision is uniquely discriminatory against DME because the Commission had *never* limited inclusion of an MOU's GFT in TCOS rates prior to DME's Application.

### 3. The Commission's exclusion of the 6% ROI is not based on any established legal authority, or even its own precedent.

An agency order may be arbitrary and capricious if the agency has improperly based its decision on non-statutory criteria.  *Texas Dep't of Ins. v. State Farm Lloyds*, 260 S.W.3d 233, 245 (Tex. App.—Austin 2008, no pet.).  Here, the exclusion of the GFT absent any authority constitutes arbitrary and capricious action by the Commission.

### a. The Commission discriminatorily imposes an arbitrary standard to disallow the 6% ROI.

Limiting the inclusion of a reasonable GFT in TCOS rates is not prescribed by rule, law, or Commission precedent.  (RR at Ex. 1, AR 118 at 18:17–19.)  The Commission admits that no authority exists explicitly addressing GFTs in TCOS rates.  (Supp. CR 295–97.)  Rather than applying the relevant authorities that *do* exist (such as the Supreme Court precedent of *City of San Antonio* that has stood for nearly a half century), the Commission insists on creating and applying—for the first

time ever, without reference to any existing authority—a standard that a transfer must be "directly tied" to the costs of providing transmission service. (Supp. CR 290.) The Commission asserts that Denton is using the 6% ROI from DME to fund operations unrelated to the cost of providing transmission service, and that this justifies complete disallowance of the transfer. (Supp. CR 290.) But the Commission has regularly granted inclusion of comparable or higher GFTs without any inquiry into whether the percentage is "directly tied" to transmission costs.[11]

The Commission's approach rests entirely on the improper creation and application of extra-statutory criteria and thus must be reversed. *A-*

---

[11] Tracing approval of an explicit GFT percentage in TCOS rates can be challenging because the Commission rarely addresses it as a specific contested issue or line item in its orders. This illustrates that the Commission seldom scrutinizes MOU inclusion of a GFT and has certainly never previously established or applied any "directly tied" rule. For example, the Commission approved a GFT of 9% for City of College Station and an 8.85% GFT for the City of Austin, but the final orders issued in these dockets make no mention of evaluating the requested GFTs according to a "directly tied" rule, nor is there any mention of such a standard in other key filings such as testimony, Proposals for Decision, or settlement agreements. DME has yet to find any orders imposing the "directly tied" rule the Commission attempts to impose on DME in this case. *See* Tex. Pub. Util. Comm'n, *Application of the City of College Station to Change Rates for Wholesale Transmission Service*, Docket No. 52728 (final order) (Jul. 11, 2024); Tex. Pub. Util. Comm'n, *Application of City of Austin dba Austin Energy to Change Rates for Wholesale Transmission Service*, Docket No. 31462 (final order) (Jun. 9, 2006).

*TAP, Inc. v. Tex. HHS Comm'n*, 2025 Tex. App. LEXIS 2553, at *6 (Tex. App.—Austin [15th Dist.] 2025, no pet.) (acknowledging statutory principle that courts must reverse and remand agency decisions that "are in excess of the agency's statutory authority . . . "); Tex. Gov't Code § 2001.174(2)(B); s*ee also City of El Paso*, 883 S.W.2d at 184 (a decision is arbitrary and capricious, and should be reversed, when the agency "considers an irrelevant factor."). The Commission has never disallowed MOU recovery of a GFT in TCOS rates and it certainly has never applied (or even mentioned) this "directly tied" standard, not even in the Final Order in this case.

The Commission claims the "directly tied" concept is the standard "under the Commission's rules and authorizing statute," (Supp. CR 290.) but cites **no authority** in the rules or statutes where this standard is established.[12] In fact, the single rule the Commission relies on to argue its position *does not apply to MOUs*; it 1) is only applicable to retail distribution rates and 2) specifically applies to a definition of "electric utility" that excludes MOUs. (Supp. CR 292, citing 16 Tex. Admin. Code

---

[12] The concept of "directly tied" in connection with GFT did not exist and did not apply until the Commission made it up, functionally from the dais, during consideration in a different case. (*See* Supp. CR 290, n.25.)

49

§ 25.231(b)[13].)  Thus, the only rule/principle cited by the PUC does not apply to transmission rates, nor does it apply to MOUs in *any* context. The Commission's decision is arbitrary because the "standard"—the factor it considered in sharply limiting DME's GFT—has no grounding in any rule or statute applicable to an MOU's rates.  *City of El Paso*, 883 S.W.2d at 184.

The only source the Commission points to for the "directly tied" standard is Commission Staff's testimony offered at the SOAH hearing, which testimony relied solely on commissioner statements made during an open meeting in January 2023.  (Supp. CR 290, n.25.)  If the sole source of "authority" is commissioner statements made at a meeting—and the record makes clear that *is* the sole source—that is illegal *ad hoc* rulemaking.  *Tex. State Bd. Of Pharm. v. Witcher*, 447 S.W.3d 520, 527 (Tex. App.—Austin 2014, pet. denied) ("A rule that is not properly promulgated under mandatory APA procedures is invalid . . . and an agency decision based on an invalid rule must be reversed and remanded to the agency if substantial rights of the appellant have been prejudiced

---

[13] Under 16 Texas Administrative Code Section 25.5(42)(A), the term "electric utility" explicitly excludes a municipal corporation.

thereby.") (citing *El Paso Hosp. Dist. v. Tex. HHS Comm'n*, 247 S.W.3d 709, 715 (Tex. 2008)[14]). But to make the matter even more untethered from the requirements for rulemaking, the "creation" of this standard did not even occur in the context of Denton's case. During the Commission's consideration of a separate docket, a single commissioner recommended that the applicant be limited to a 5% GFT based on the specific facts of that case. (RR at Ex. 1, AR 208 at 41–48.) Comments made by one commissioner in a meeting are not precedent, and certainly do not establish a valid Commission rule pursuant to APA procedures. Texas courts have ruled that "it is immaterial what a commissioner may have said or thought in the process of arriving at his decision. The thought processes or motivations of an administrator are irrelevant in the judicial

---

[14] The "directly tied" standard was applied here as a broad and prescriptive rule by the Commission: "[u]nder the Commission's rules and authorizing statute, the Commission is required to review Denton's requested inclusions to determine whether they are directly tied to the actual cost of providing transmission service . . . " (Supp. CR 290); *see Witcher*, 447 S.W.3d at 529 (observing that a standard meets the APA definition of a rule if it implements, interprets, or prescribes the agency's policy that affects parties' rights and has implications beyond the parties to the underlying proceeding). While there may be certain limited circumstances where a rule promulgated outside of the APA procedures in an adjudicative proceeding could be allowed, none of those circumstances are present here. *Id.* (allowed only in the limited circumstances of the agency dealing with "(1) an issue of first impression, (2) a new or amended statutory scheme or administrative rules, or (3) an issue that cannot be adequately captured within the bounds of a general rule because the problem is so specialized and varying in nature.")

determination whether the agency order is reasonably sustained . . . " *City of Frisco v. Tex. Water Rights Comm'n*, 579 S.W.2d 66, 72 (Tex. App.—Austin 1979, writ ref'd n.r.e.). Moreover, the Commission subsequently *rescinded* the order issued from the open meeting where the "directly tied" standard was discussed, and the order in that case itself made no mention of a "directly tied" standard nor did it ultimately limit that applicant's GFT. *See* Tex. Pub. Util. Comm'n*, Application of the City of College Station to Change Rates for Wholesale Transmission Service*, Docket No. 52728 (Sep. 14, 2023) (order remanding proceeding at 1 ("The Commission rescinds its January 26, 2023 remand order and issues this new remand order.")).

The Commission thus hangs its hat on a "standard" that is not only found nowhere in any governing law, was never promulgated as a formal rule pursuant to the APA, was not only based only on a single Commissioner's comment in support of an order that was ultimately rescinded, but also has never before been used to evaluate GFT inclusion in TCOS rates. And how would it have ever been used before if it doesn't actually exist anywhere? The Commission's argument imposes and applies as an illegal *ad hoc* rule a mere concept that was loosely discussed

during one open meeting during the pendency of DME's application. Commission Staff's own witness characterized the commissioners' comments as nothing more than a "concern." (RR at Ex. 1, AR 208 at 14:13–18.) Concerns are not law, and they certainly do not grant an agency authority that the Legislature did not grant.

There is no regulatory certainty when the comments of one commissioner in a docket to which DME was not a party can be the sole basis for denying inclusion of a statutorily authorized transfer.[15] Indeed, the "directly tied" *ad hoc* rule, which the Commission stated it is *required* to follow (Supp. CR. 290), doesn't appear to be followed as a rule at all; the Commission has approved inclusion of higher GFTs than DME's without any scrutiny of whether the transfer was "directly tied" to the costs of providing transmission service.[16] The Commission's decision

---

[15] A required aspect of open government is to provide due notice to the public of matters to be considered and discussed. *See* Tex. Gov't Code § 551.001, et seq. The Commission's entire basis for disallowing DME's 6% ROI transfer is drawn from discussion and inquiry during an open meeting where neither DME nor the public had notice that a new "rule" (as that is how the Commission is treating this "directly tied" standard) was to be considered, much less adopted and applied to future cases going forward.

[16] *See* Tex. Pub. Util. Comm'n, *Application of the City of College Station to Change Rates for Wholesale Transmission Service*, Docket No. 52728 (approving a 9% GFT) (Jul. 11, 2024) (final order); Tex. Pub. Util. Comm'n, *Application of City of Austin dba Austin Energy to Change Rates for Wholesale Transmission Service*, Docket No. 31462 (approving 8.85% GFT) (Jun. 9, 2006) (final order).

imposes on DME—and apparently, *only* DME—an *ad hoc* manufactured standard not grounded in any rule or law. That unprecedented, unsupported, and thus far never-followed-again path is by definition arbitrary, capricious, and discriminatory. *El Paso Hosp. Dist.*, 247 S.W.3d at 715; *City of El Paso*, 883 S.W.2d at 184.

### b. The language of PURA Chapter 35 supports inclusion of DME's 6% ROI transfer.

Chapter 35 of PURA is the only statutory basis for the Commission's oversight of TCOS rates. (RR at Ex. 1, AR 168 at 83:15–18.) That is the sole font from which all relevant Commission authority in this case must spring. And the glaring deficiency in the Commission's *ad hoc* "directly tied" standard is that it is not based on the language of the only applicable statute. To the contrary, the text of PURA Section 35.004(a) supports inclusion of a reasonable GFT in TCOS rates.

That subsection of PURA establishes a comparability standard by requiring that wholesale transmission rates correspond to a utility's own use of its system. DME's "system" includes both transmission and distribution services. (CR 20.) As such, any analysis of DME's "use of its system" should account for DME's overall costs for maintaining its system and running its entire utility.

DME is mandated, through the city Charter, an ordinance, and a financial memo, to make a GFT totaling 11%. (RR at Ex. 1, AR 176 at 366, 370, AR 182.a at 198–99.) The City requires this of DME pursuant to its undisputed statutory authority. Tex. Gov't Code § 1502.059. The GFT is a required part of DME's total financial obligations. (RR at Ex. 1, AR 176 at 176:12–14.) Rating agencies treat a GFT as an operating expense because it is a required recurring payment. (RR at Ex. 1, AR 176 at 177:11–15.) The GFT is a required part of the rates and terms of DME's own use of its system. In accordance with the language of the statute, the GFT should be included within DME's wholesale transmission rates *so that the rates mirror DME's use of its system*. Disallowing DME's 11% GFT would mean DME actually is prohibited from recovering a specific and reasonable component of the use of its system, in violation of PURA.

In addition to the comparability standard under subsection (a), PURA Section 35.004(c) establishes a reasonableness standard to ensure there is no disparity between customer classes. The Commission's decision effectively requires DME's distribution customers to subsidize, or "bear the costs of the service," of DME's wholesale transmission

customers. This violates the Commission's statutory role and mandate of ensuring rates are reasonable and non-discriminatory. PURA § 35.004 (b)–(e); *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Texas*, 253 S.W.3d 184, 193 (Tex. 2007).

### 4. DME's ROI component is comparable to other utilities' payments to the City.

The 6% ROI component provides cost recovery to the City of revenue streams DME would otherwise have to pay to the City as a stand-alone utility if not for the fact that it is a business unit of the City. (RR at Ex. 1, AR 176 at 55:14–17.) DME's testimony explained that if an IOU were to serve the City, the IOU would pay more than only franchise fees. (RR at Ex. 1, AR 118 at 18:22–19:2.) Witnesses for both OPUC and Commission Staff conceded that they would expect another electric utility operating within the City to pay more than just a 5% franchise fee. (RR at Ex. 1, AR 168 at 70:7–23, 82:12–83:6.) The record shows that other utilities also would pay, at a *minimum*, ad valorem taxes on property owned within the City.

Mark Garrett, witness on behalf of OPUC, and Ruth Stark, Commission Staff witness, confirmed that if a third-party utility (that is, a

utility that was not DME) paid to a city fees beyond the franchise fee, that utility would pay a municipality more than 5%.

Q: *Okay. But you would agree with me that if a utility who is using the city's rights of way pays a five percent franchise fee and then some other tax amount on that top of that they would be receiving more than five percent from the utility. Correct?*

A: If they paid five percent franchise plus other taxes, yes, I would agree with that.

(RR at Ex. 1, AR 168 at 70:7–23.)

\*\*\*

Q: *Okay. Do you know if other utilities pay taxes to the city on top of any franchise fees it might pay?*

A: Are you speaking specifically to Denton or to municipalities, in general?

Q: *Either one. If you -- we can start on a macro level. Do you know, generally speaking, in Texas, do utilities pay cities anything beyond franchise fees to operate within its service --within the boundaries of that city?*

57

A: To the extent that they own property within the city, I know they pay ad valorem taxes.

Q: *Okay. Do you know about Denton, in particular?*

A: I don't know if other utilities have property within -- within Denton.

Q: *Okay. Okay. But you would agree with me that if a utility is operating within a city and it pays some sort of taxes or fees beyond the franchise fees that the city would actually receive more than just the five percent franchise fee from that utility. Correct?*

A: That's correct.

(RR at Ex. 1, AR 168 at 82:12–83:6.)

There was no testimony or evidence offered to the contrary. By disallowing ROI as part of the GFT, the Commission is plainly discriminating against DME as compared to other utilities. Both Mr. Garrett and Ms. Stark testified that they would expect that a non-DME electric utility operating within a municipality would pay more than the 5% franchise fee rate. The Commission's action thus improperly limits the amount of money the City receives for operating its own utility.

58

The GFT is a required part of the rates and terms of DME's own use of its system; the 6% ROI transfer is mandated by the city Charter, an ordinance, and a financial memo. (RR at Ex. 1, AR 182a. at 198–99, AR 208 at 31–32.) The 6% ROI is not a means to "fund a budget gap," as alleged by the Commission (Supp. CR 286), but is a transfer (the right to which is enshrined in statute) that reflects the risk of utility ownership and ensures the City receives the same payments it would from any other utility operating in its jurisdiction.

However, even if the Commission, though it has no authority or basis to do so, believed that 6% was too high or questioned why it was different from the City's water and wastewater ROIs (it did not; its decision was based entirely on its new, to-be-applied-to-only-one-entity "directly tied" rule, and of course, its foundational decision to penalize the City for past "overearning" which has never actually occurred), the Commission did not even set DME's ROI to match the City's water and wastewater MOUs, which would result in a GFT of 8.5% (5% franchise fee, 3.5% ROI). Rather, the Commission's decision to penalize DME and apply its *ad hoc* "directly tied" rule led to a decision to *completely prohibit* any recovery of the ROI component and allow only a 5% GFT. That decision goes far beyond general

59

reasonableness and oversight (again, never mind that those powers do not and cannot supplant the exclusive grant of the power to cities to set a GFT via Government Code Section 1502.059). There is no justification in the record, and it contradicts State law, to bar ROI from a GFT altogether. The Commission did not cite any authority to do so or any case in which it has previously done so (and DME is not aware of any case in which the Commission has done so since). Nor did Commission Staff. Nor did the Intervenors.

The Commission's discriminatory decision to bar Denton from receiving from DME what any other utility would pay to the City imposes an unprecedented policy that results in the City *losing* money by operating its own utility. If the City receives more than 5% in payments from IOUs operating within its boundaries (also paid for by all ERCOT ratepayers), then why must the City receive *less* in compensation from its own utility? The Commission argues that ERCOT ratepayers should not subsidize this additional payment to the City, but those same ERCOT ratepayers are funding functionally identical payments when they pay an IOU's TCOS rate. The Commission's decision highlights the disparate treatment of types of utilities at the Commission—ratepayers across

60

ERCOT are expected to fund IOUs' dividend payments that are sent across the globe but are not expected to fund repayment to Texas cities and those Texas citizens who bear the risk of operating their own utilities.

This result raises the question why an MOU would be incentivized to contribute to transmission in Texas at all—a critical repercussion of the Commission's arbitrary decision, considering the Commission's current emphasis on transmission buildout. The Legislature has called on the Commission to initiate robust transmission reliability plans.[17] MOUs should be incentivized to participate in efforts to increase reliability and improve transmission infrastructure if those matters are indeed to be addressed system-wide. On top of the layers of illegalities underlying the Commission's decision, denying an MOU recovery of a reasonable transfer specifically permitted under Texas law also is incongruent with the state's policy goal of incentivizing contribution to

---

[17] *See e.g.*, Tex. Pub. Util. Comm'n, *Reliability Plan for the Permian Basin under PURA Section 39.167*, Project No. 55718; and enabling legislation, HB 1500, specifically requiring the Commission to study the need for increased transmission capacity throughout the state.

transmission buildout. It makes no sense, of either the legal or common variety.

### 5. The Commission's decision negates the right to make a GFT under Texas law.

Pursuant to Texas Government Code Section 1502.059, DME may transfer a portion of its revenue to the City's general fund for general or special purposes. The Commission's unilateral voiding of that power—especially by applying a made-up "directly tied" rule to punish DME for fictional "overearning"—unlawfully intrudes on a statutory grant of authority that the Legislature made to cities alone.

Acting under that authority and by the mechanisms provided therein, the City by ordinance requires DME to make a 6% ROI transfer to the City for the risk of ownership and to account for other fees any other utility operating within the City would pay. The Commission's decision imposes an arbitrary standard to discriminatorily bar recovery of DME's 6% ROI and prevents the City from receiving a reasonable statutorily authorized transfer. The Commission's decision invalidates the exact scenario contemplated under the statute—a city may use revenues from its municipal utility to fund other city purposes. The statutory grant of authority unambiguously says that a City "may use *for general or special*

62

*purposes*" such transferred revenues. Tex. Gov't Code § 1502.059 (emphasis added). Consistent with that broad grant of permission to use transferred revenues for any general or special purpose, neither that statute nor any other contains any requirement or limitation that such purposes be related only to the specific services the municipal utility provides. *Id.* Both things cannot be true: either the City may transfer funds "for general or special purposes," *or* such transfers must be "directly tied" to the actual cost of providing transmission service. The permissible purposes (any general or specific purpose) that are written in the statute are true. The purpose-based limitation created and applied by the Commission in this case is not.

The Commission has characterized the ROI component of the GFT as "additional compensation" entirely unrelated to providing transmission service (Supp. CR 280), but that characterization has no meaning or legal import; as addressed above, the requirement that a general fund transfer of utility revenues be "directly tied" to the costs of providing transmission service is made up and unsupported by the law. The Commission further accuses the City of asserting an "unlimited taxing power" in its request for recovery of a reasonable GFT. (Supp. CR 297.) The Commission's argument tilts at windmills; DME's TCOS Application proposed a total GFT of 11%,

63

which is far from an "unlimited" transfer. DME's 6% ROI component of its GFT is permitted by statute, required by the City, and within the range that the Commission has historically approved.

If the Commission's decision stands and DME is prohibited from recovering its reasonable authorized GFT in its rates, the Commission has overruled and effectively nullified the authority granted to the City by the Legislature under the Government Code.

## B.  Requiring DME to file an interim TCOS application finds no basis in enabling statutory authority or in the administrative record.

Finally, the Commission's order requiring the City to file an interim TCOS proceeding within 90 days of the Final Order has no basis in law or the factual record, and the City's substantive rights have been prejudiced by being subjected to an impermissibly ordered interim TCOS proceeding. The other components of the Commission's order addressed in this appeal and at the administrative appeal in the district court below demonstrated the Commission's willingness to disregard some of the most basic guardrails, like the requirements of the Texas Open Meetings Act and the principle that an agency only has those powers expressly granted to it by the Legislature. The matter of the Commission ordering DME to file an interim TCOS

application, when no authority to do so can be found, is similarly improper. The Commission's ongoing zeal to "punish" DME for its non-existent "overearning" surely provides some explanation for that pattern, but in the end, such an explanation should not be mistaken for a permissible excuse.

Again, the Final Order also refers to the Commission's authority under Section 35.004(c) of PURA as authorizing this particular element of the Final Order, but the Commission's jurisdiction over MOUs is limited to the limitations expressed in PURA Chapter 40. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 199 (Tex. 2007). PURA Section 40.004 specifically grants the Commission jurisdiction over MOUs in very limited circumstances. PURA § 40.004. Specifically, the Commission is granted authority "to regulate wholesale transmission rates and service…to the extent provided in Subchapter A, Chapter 35." *Id.* at § 40.004(1). Thus, the Commission's authority to regulate an MOU's transmission rates lies entirely within Chapter 35, and nowhere in PURA Chapter 35 is there a grant of authority for the Commission to order an MOU to file a rate proceeding.

The distinct lack of such authority in Chapter 35 of PURA, which applies to MOUs, contrasts with Chapter 36 of PURA, which applies to other

utilities.  PURA Section 36.157(e) actually *does* expressly provide for "the ability of a regulatory authority to initiate a base rate proceeding at any time under this title."  PURA § 36.157(e).  There is no analog in Chapter 35.

What is not in a statute—in this case, Chapter 35's lack of a grant of authority to the Commission to initiate an MOU TCOS rate proceeding—is just as important as what is in the statute.  *Burns v. City of San Antonio*, 2025 Tex. App. LEXIS 2267, *21 (Tex. App.—Austin [15th Dist.] 2025, no pet.) (applying the maxim that "[w]e assume that the Legislature chose its words with care, including each for a purpose and deliberately omitting others," this Court held that the Expedited Declaratory Judgment Act's express provision for one path to post-judgment appeal (via the accelerated appeal mechanism) while failing to mention or provide for any other post-judgment path to challenge the trial court's jurisdiction, means that all such other paths are barred.)

We know that the Legislature knows how to grant that authority to the Commission; it did so in Chapter 36.  Therefore, the Legislature's decision *not* to grant the Commission that authority in Chapter 35 must be given effect.  The Legislature did not grant the Commission the authority to

66

initiate a TCOS proceeding with respect to MOUs, so the Commission does not have that authority.

Functionally conceding that there is no statutory authority for its Order that DME file an interim rate proceeding, the Commission looks to 16 Texas Administrative Code Section 25.247 to support its imposition of this requirement on DME—which is not a statute at all, but is a Commission substantive rule for which there is no enabling statutory authority as noted above. This oversight authority was not granted by the Legislature—it's a self-authorizing oversight power the Commission is claiming.

This is not the first instance in PUC Docket No. 52715 where the Commission has attempted to assert extra-statutory authority.

| | |
|---|---|
| Order DME to file Wholesale TCOS Application (initiating this docket) (RR at Ex. 1, AR 2 at 4) | No Authority |
| Ordering DME to file a Depreciation Study (RR at Ex. 1, AR 29 at 3–4; Order on Appeal of Order No. 4; AR 45) | No Authority |
| Ordering the imposition of Interim Rates During Pendency of TCOS Rate Case[18] | No Authority |

---

[18] DME challenged in district court the Commission's order of interim rates in PUC Docket No. 52715. *City of Denton v. Lake, et al.*, Cause No. D-1-GN-22-006855. The district court granted a permanent injunction prohibiting the Commissioners from setting interim rates in connection with DME's TCOS Application as there was no basis for the Commission to do so under the law.

| Limit DME's Debt-Service-Coverage Ratio Based on a Rate-Filing Package Adopted in Violation of the Texas Open Meetings Act | No Authority |
|---|---|
| Limit DME's General Fund Transfer by Excluding the 6% Return-on-Investment Component in its Entirety | No Authority |

The order to file an interim proceeding is no different than the other efforts to try to take "corrective" action in this docket.

The Commission's intent to fill what it believes are policy gaps is clear from the Final Order. Finding of Fact No. 59 states, "Given the particular circumstances of this docket, it is in the public interest to require Denton to file an interim TCOS proceeding within 90 days of the final order in this docket." (RR at Ex. 1, AR 159 at 9.) There is no citation to authority. There are no facts that the Commission uses to explain the "particular circumstances." This finding is the definition of arbitrary to support a desired end-result. It seems that the Commission *wants* this power, and believes it would serve the sort of general policy purposes for which the Commission exists. Those positions may or may not have merit, but they are positions that must be considered by the Legislature in choosing whether or not to grant the Commission this power. Again,

the Commission is acting *ultra vires* and is elevating itself to a legislative rather than regulatory role.

The Commission therefore erred in ordering DME to file an interim rate proceeding and its Order to that effect should be reversed.

## CONCLUSION AND PRAYER

Appellant therefore respectfully asks the Court to reverse the Public Utility Commission's Final Order, as well as the Final Judgment of the district court denying DME's administrative appeal of the Public Utility Commission's Final Order, as to the Final Order improperly setting DME's GFT at 5% instead of 11% and ordering DME to file interim rate proceeding, reversing both such elements of the Final Order, remanding the GFT issue to the Commission for further action consistent with this Court's decision, and reversing and excluding from DME's TCOS rate the results of the interim rate proceeding. Appellant further respectfully requests any and all other relief to which Appellant may be justly entitled.

Respectfully submitted,

**LLOYD GOSSELINK**
 **ROCHELLE & TOWNSEND, P.C.**
816 Congress Avenue, Suite 1900
Austin, Texas 78701
(512) 322-5800 Phone
(512) 472-0532 Facsimile

By:    */s/ Jose E. de la Fuente*
        JOSE E. de la FUENTE
        State Bar No. 00793605
        jdelafuente@lglawfirm.com
        GABRIELLE C. SMITH
        State Bar No. 24093172
        gsmith@lglawfirm.com
        JAMIE L. MAULDIN
        State Bar No. 24065694
        jmauldin@lglawfirm.com
        ROSLYN M. WARNER
        State Bar No. 24117520
        rwarner@lglawfirm.com

**ATTORNEYS FOR**
**CROSS-APPELLANT**

71

# CERTIFICATE OF COMPLIANCE

I, Jose E. de la Fuente, attorney for Appellants, certify that this document was generated by a computer using Microsoft Word 365, which indicates that the word count of this document is 9971 per Tex. R. App. P. 9.4(i).

/s/ *Jose E. de la Fuente*
JOSE E. DE LA FUENTE

## INDEX OF APPENDICES

**App. A**      Final Judgment and Order (CR 60–61)

**App. B**      Order on PUC Docket No. 52715, October 12, 2023 (RR at Ex. 1, AR 159)

**App. C**      Tex. Gov't Code § 1502.059

**App. D**      Tex. Gov't Code § 2001.174

**App. E**      Tex. Loc. Gov't Code § 552.001

**App. F**      PURA § 15.001

**App. G**      PURA § 31.001

**App. H**      PURA § 35.004

**App. I**      PURA § 36.157

**App. J**      PURA § 40.004

**App. K**      16 Tex. Admin. Code § 25.192

**App. L**      16 Tex. Admin. Code § 25.247

**App. M**      Final Judgment and Permanent Injunction, *City of Denton v. Lake, et al.*, Cause No. D-1-GN-22-006855 (200th District Court, Travis County, Texas) (Apr. 19, 2023).

**App. N**      Denton City Charter Section 12.03

# APPENDIX A

CAUSE NO. D-1-GN-23-008974

| | | |
|---|---|---|
| CITY OF DENTON | § | IN THE DISTRICT COURT |
| OPERATING AS DENTON | § | |
| MUNICIPAL ELECTRIC | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| PUBLIC UTILITY COMMISSION OF | § | |
| TEXAS, | § | |
| *Defendant.* | § | |
| | § | 459th JUDICIAL DISTRICT |

## FINAL JUDGMENT AND ORDER

On November 13, 2024, the hearing on the merits was held in the judicial review of the Public Utility Commission's (the "Commission") Final Order (the "Final Order") in *Application of Denton Municipal Electric to Change Rates for Wholesale Transmission Service*, PUC Docket No. 52715. All parties appeared through counsel, and the administrative record was admitted into evidence.

The Court reviewed the Final Order in this appeal pursuant to Texas Utilities Code § 15.001 and Texas Government Code § 2001.174. Based on the pleadings, administrative record, briefs submitted, and argument of counsel, it is the opinion of the Court that the Commission's Final Order erred by limiting DME's debt service coverage ratio to 1.25x and this error prejudiced the substantial rights of plaintiff/appellant DME.

The Court specifically finds that the Final Order prejudiced the substantial rights of plaintiff/appellant DME and should be reversed as follows:

60

The Commission's decision to set DME's debt service coverage ratio at 1.25x, including and as stated/incorporated in Findings of Fact provisions 50–58A, Conclusions of Law provisions 9–11A, and Ordering Paragraphs 1-5 of the Final Order, was arbitrary and capricious and was improperly based on a Rate Filing Package that was modified in violation of state law (the Texas Open Meetings Act) and Commission Rule, thus constituting a violation of both a statutory provision and required procedure, and is hereby reversed.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that the Commission's Final Order provision limiting DME's debt service coverage ratio to 1.25x is reversed and remanded to the Commission for further proceedings consistent with this Order.

The Court denies all other relief not granted in this Final Judgment. This Final Judgment disposes of all parties and all claims and is appealable. All costs of court in this cause are adjudged against Defendant.

Signed on January 14, 2025

Hon. Maya Guerra Gamble
Presiding Judge

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office On _____

03/03/2025 09:18:51

VELVA L. PRICE
DISTRICT CLERK
By Deputy: VNB

# APPENDIX B



Control Number: 52715



Item Number: 194

| APPLICATION OF DENTON | § | PUBLIC UTILITY COMMISSION |
| MUNICIPAL ELECTRIC TO CHANGE | § | |
| RATES FOR WHOLESALE | § | OF TEXAS |
| TRANSMISSION SERVICE | § | |

## ORDER

This Order addresses the application of Denton Municipal Electric (Denton) to change its transmission cost of service (TCOS) and wholesale transmission rates in the Electric Reliability Council of Texas (ERCOT) region. On August 8, 2023, the State Office of Administrative Hearings (SOAH) administrative law judges (ALJs) filed a proposal for decision (PFD) recommending that the Commission approve Denton's TCOS, with adjustments, and approve Denton's annual wholesale transmission rate, ERCOT export rates, and rate-case expenses.

The Commission adopts the proposal for decision, including findings of fact and conclusions of law, to the extent provided in this Order.

A new finding of fact is added after finding of fact 42 and a new finding of fact is added after finding of fact 46 to support the Commission's conclusions on the reasonableness of the general fund transfers. Findings of fact 43, 47, and 48 are modified for clarity. Finding of fact 44 is deleted because its contents are duplicative of information elsewhere in the order.

New findings of fact are added after finding of fact 48, finding of fact 49 is modified, and new findings of fact are added after finding of fact 58 to reflect the Commission-approved TCOS and to reflect the rate schedules produced by Commission Staff's number run. Findings of fact 60 and 61 are modified to make findings of fact rather than conclusions of law. A new finding of fact is added after finding of fact 61 to state the effective date of the rates approved by this Order.

Conclusion of law 1 is modified for accuracy. A new conclusion of law is added after conclusion of law 11 to reflect the Commission-approved rate of return. Conclusion of law 14 is modified for clarity. New conclusions of law are added after conclusion of law 16 to reflect the Commission-approved TCOS and to reflect the rate schedules produced by Commission Staff's number run. Conclusion of law 17 is modified and a new conclusion of law is added before it to

194

support the Commission's order that Denton file an interim TCOS proceeding within 90 days after this Order is filed. Conclusions of law 7, 8, 9, 12, 13, and 15 are modified to apply law to the facts of this case.

## I. Findings of Fact

The Commission adopts the following findings of fact.

### *Applicant*

1. Denton Municipal Electric (Denton) is a municipally owned electric utility owned and operated by the City of Denton (City) under certificate of convenience and necessity number 30046.

2. Denton owns and operates for compensation in Texas facilities and equipment to transmit and distribute electricity in the Electric Reliability Council of Texas (ERCOT) region.

### *Application; Amended Application*

3. On November 1, 2021, Denton filed an application with the Commission to change its transmission cost of service (TCOS) and wholesale transmission service rates.

4. On December 12, 2021, Denton filed an amendment and supplement to its application.

5. Denton's application is based on a test year ending September 30, 2020.

6. In Commission Order No. 4 filed on January 31, 2022, the Commission ALJ found that Denton was not required to submit a depreciation study as part of the Commission's rate-filing package for non-investor-owned transmission service providers.

7. Commission Staff and the Office of Public Utility Counsel (OPUC) filed an appeal of Order No. 4 on March 4, 2022.

8. On May 12, 2022, the Commission issued an Order on Appeal of Order No. 4 granting the appeal and ordering Denton to amend its application to include a depreciation study.

9. On December 1, 2022, Denton filed an amended application to change its TCOS and wholesale transmission service rates, which included additional testimony and a depreciation study.

10. In the amended application, Denton asked the Commission to approve an annual TCOS of $38,446,435, a transmission rate base of $194,443,862, and an annual wholesale transmission rate of $0.541980 per kilowatt (kW).

11. In the amended application, Denton requested a rate of return of 11.99% calculated using a debt service coverage (DSC) ratio of 1.75x.

12. The amended application includes an 11% general fund transfer (GFT) consisting of a franchise fee component (franchise fee GFT) and a 6% return on investment component (ROI GFT) in schedule E-2, taxes other than income taxes.

13. Denton asked to recover its reasonable and necessary rate-case expenses from its wholesale transmission service customers through a surcharge over a six-month period.

14. In State Office of Administrative Hearings (SOAH) Order No. 14 filed on May 23, 2023, the SOAH ALJs found the application administratively complete.

## Notice

15. On November 5, 2021, Denton filed the affidavit of Lambeth Townsend, then-authorized legal representative for Denton, attesting that notice of the application was provided by first class mail on November 1, 2021, to the distribution service providers in Docket No. 51612,[1] all parties in the last complete review of Denton's transmission cost of service, Docket No. 30358,[2] and the OPUC.

16. In Commission Order No. 2 filed on November 23, 2021, the Commission ALJ found the notice sufficient.

## Intervenors

17. In Commission Order No. 2 filed on November 23, 2021, the Commission ALJ granted intervenor status to OPUC.

---

[1] *Commission Staff's Petition to Set 2021 Wholesale Transmission Service Charges for the Electric Reliability Council of Texas, Inc.*, Docket No. 51612, Order (May 24, 2021).

[2] *Application of Denton Municipal Electric to Change Rates for Wholesale Transmission Service*, Docket No. 30358, Order (Jun. 16, 2005).

18. In Commission Order No. 7 filed on May 5, 2022, the Commission ALJ granted intervenor status to Texas Industrial Energy Consumers (TIEC).

### *Referral to SOAH for Hearing*

19. On May 27, 2022, Commission Staff, OPUC, and TIEC requested that this case be referred to the SOAH.

20. On August 3, 2022, the Commission referred this case to SOAH for assignment of an ALJ to conduct a hearing.

21. On August 4, 2022, the Commission issued a preliminary order identifying 34 issues to be addressed in this proceeding.

22. On December 20, 2022, the SOAH ALJs convened a hearing on interim rates. Denton offered seven exhibits, which were admitted, and Commission Staff offered three exhibits, which were admitted.

23. On December 20, 2022, in Cause No. D-1-GN-22-006855 of the 200th Judicial District of Travis County, Texas, the court issued a temporary injunction enjoining the implementation of interim rates in this proceeding.

24. In SOAH Order No. 11 filed on January 18, 2023, the SOAH ALJs adopted a procedural schedule.

25. On May 11, 2023, SOAH ALJs Daniel Wiseman and Linda Brite convened a hearing on the merits via videoconference. The hearing on the merits concluded the same day.

26. The following parties appeared through legal counsel and participated in the hearing on the merits: Denton, Commission Staff, OPUC, and TIEC.

27. At the hearing on the merits, the SOAH ALJs admitted 19 exhibits offered by Denton, ten exhibits offered by Commission Staff, three exhibits offered by TIEC, and 11 exhibits offered by OPUC.

28. The parties filed post-hearing initial briefs on May 26, 2023, and reply briefs and proposed findings of fact, conclusions of law, and ordering paragraphs on June 9, 2023.

29. The record closed on June 9, 2023, except that it was reopened for the limited purpose of admitting exhibits related to Denton's updated rate-case expenses incurred in this docket though June 30, 2023.

## *Evidentiary Record*

30. On November 1, 2021, Denton filed the initial application, the schedules and workpapers under the non-investor owned utility TCOS rate-filing package, and the direct testimonies of Antonio Puente, Jr., Terrance P. Naulty, and Jill A. Schuepbach.

31. On December 12, 2021, Denton filed the first supplemental direct testimonies of Mr. Puente and Ms. Schuepbach.

32. On December 1, 2022, Denton filed the direct testimony of Laurie Tomczyk, and the second supplemental direct testimonies of Mr. Puente and Ms. Schuepbach.

33. On March 3, 2023, OPUC filed the direct testimony of Mark Garrett.

34. On March 31, 2023, Commission Staff filed the direct testimonies of Mark Filarowicz and Ruth Stark.

35. On April 10, 2023, Commission Staff filed the direct testimony Ethan N. Blanchard.

## *Rebuttal Case*

36. On April 24, 2023, Denton filed its rebuttal case, consisting of the rebuttal testimonies of Mr. Puente and Ms. Schuepbach.

37. In its rebuttal case, Denton accepted certain recommendations by OPUC and Commission Staff related to plant held for future use and made specific corrections to Denton's expenses and revenues, leaving only three issues in dispute: (1) whether and to what extent Denton should recover its GFTs; (2) the appropriate debt service coverage (DSC) and rate of return; and (3) whether Denton should be required to offset its TCOS with export revenues.

38. Denton's rebuttal case asked the Commission to approve an annual TCOS of $35,030,428, a transmission rate base of $192,251,567, and an annual wholesale transmission rate of $0.49382 per kW.

39. Denton's rebuttal revenue requirement included $89,347 for taxes other than income - labor and $4,095,558 for operations and maintenance expense allocated to transmission.

40.    Denton's rebuttal rate base included $827,846 for materials and supplies allocated to transmission, $523,113 in cash working capital allocated to transmission, and $3,792,668 in net general plant allocated to transmission.

41.    Denton's rebuttal case asked for a rate of return of 10.19%.

*General Fund Transfers*

42.    A trade-off for the benefits to the citizens of the City for local ownership and control of their own electric utility (i.e. control over issues like rate-setting and quality of service) is that the City does not collect all the other fees and taxes from its municipally owned utility that it would from utilities that were not owned by the City.

42A.    The City requires other non-municipally owned utilities to pay a franchise fee similar to the franchise fee portion of the GFT.

43.    Requiring a utility to substantiate all its transfers to the general fund that are included in transmission rates falls within the Commission's discretion to ascertain the reasonableness of such costs.

44.    DELETED.

45.    The City raised the ROI portion of the GFT for its electric utility to 6% of gross revenues while maintaining the previous 3.5% ROI for its water and wastewater utilities. The stated purpose of raising the rate (which was purported to be a temporary increase) was because of COVID-19.

46.    The City provided no explanation or justification for reasonableness of the increased 6% ROI rate for its electric utility when its water and wastewater utilities pay a 3.5% ROI, or why the 6% electric ROI was made permanent when it was supposed to be a temporary increase due to COVID-19.

46A.    Denton's transmission costs of service, like all transmission costs, are allocated to ratepayers across ERCOT; by contrast, City's water and wastewater utility expenses are paid by local ratepayers.

47.    Requiring justification for Denton's requested ROI GFT included in transmission rates, as well as justification for a municipality's disparate treatment of its electric utility from its

water and wastewater utilities with respect to its ROI GFT, is not burdensome and within the Commission's authority.

48.     Denton has established the reasonableness of the franchise fee component of its general fund transfer but has not sufficiently substantiated the remaining 6% for ROI component's inclusion in transmission rates.

### *Post-Test-Year Adjustments to Rate Base*

48A     Denton's rebuttal case requested $223,195,137 in original cost of transmission plant in service, including a post-test-year adjustment of $25,502.626 in additional transmission plant installed from October 1, 2020 through June 30, 2021.

48B.    Denton's rebuttal case requested an accumulated depreciation of $36,087,186 in electric transmission plant, including a post-test-year adjustment of $3,923,648 in accumulated depreciation of electric transmission plant installed from October 1, 2020 through June 30, 2021.

48C.    Denton's rebuttal case requested an accumulated depreciation of $7,316,963 in general plant allocated to transmission functions, including a post-test-year adjustment for accumulated depreciation of general plant installed from October 1, 2020 through June 30, 2021.

48D.    The post-test-year adjustment to invested capital reflects known and measurable changes to historical test-year data.

### *Cash Working Capital*

48E.    Denton's reasonable and necessary ERCOT transmission cash working capital is $523,113.

### *Total Rate Base*

48F.    Denton's investments are reasonable and necessary and used and useful to the public.

48G.    Denton's total ERCOT transmission rate-base is $192,251,567.

### *Other Revenues — Export Revenue*

49.     Denton's TCOS should be offset by the amount of export revenues it should have collected during the test year, which is $16,313.

## *Debt Service Coverage and Rate of Return*

50. The instructions in the rate filing package, both before and after modification, provide that the Commission only resorts to consideration of the board of director's policy in lieu of DSC requirements stated in the transmission service provider's (TSP) bond resolutions.

51. The stated DSC ratio in Denton's most recent debt issuance is 1.25x.

52. At the time of Denton's initial application, the rate filing package provided that the DSC levels stated in the TSP's most recently issued bond covenants plus additional coverage of 0.25 for municipal utilities shall be presumed reasonable.

53. The rate filing package is not law.

54. The Commission's October 6, 2022 modification of the rate filing package removed a rebuttable presumption, which is a procedural change that does not affect a vested substantive right.

55. The modified rate filing package provides that an applicant may request an additional 0.25x to the DSC ratio if the applicant shows that it has utilized short-term debt financing as an alternative to long-term debt financing in a cost-effective manner.

56. Denton's amended application was filed on December 1, 2022, after the rate filing package was modified.

57. No evidence was presented showing that Denton utilized short-term debt financing as an alternative to long-term debt financing.

58. The 1.25x DSC ratio set forth in Denton's most recent debt issuance should be adopted and applied to Denton's rebuttal case, which results in a rate of return of 6.21%.

58A. Denton's return on transmission rate base is $11,930,303.

## *Expenses*

58B. Denton's reasonable and necessary total operating expenses for ERCOT transmission are $13,548,937.

58C. Denton's reasonable and necessary operation and maintenance expenses for ERCOT transmission are $4,095,558.

58D.    Denton's reasonable and necessary administrative and general expenses for ERCOT transmission are $2,179,505.

58E.    Denton's reasonable and necessary depreciation expenses for ERCOT transmission are $7,786,085.

58F.    Denton's total operating expenses are reasonable and necessary to provide service to the public.

### *TCOS and Wholesale Transmission Rate*

58G.    The annual transmission revenue requirement that will allow Denton a reasonable opportunity to earn a reasonable return on its invested capital used and useful in providing service to the public in excess of its reasonable and necessary operating expenses is $25,479,240, which results in a TCOS of $25,462,927 after deductions.

58H.    Denton's annual wholesale transmission rate is $$0.35895 per kW per year. based on the average four-coincident peak demand in ERCOT for 2020.

58I.    Denton's TCOS and wholesale transmission rates are just and reasonable.

### *ERCOT Export Rate*

58J.    Denton's hourly rate for power to be exported from ERCOT is $0.000041 per kW.

### *Interim TCOS Filing and Rate-Case Expenses*

59.    Given the particular circumstances of this docket, it is in the public interest to require Denton to file an interim TCOS proceeding within 90 days of the final order in this docket.

60.    Denton's proposed rate-case expenses of $738,327.89 incurred from October 1, 2021 through June 30, 2023 are reasonable, as attested to by the affidavit of attorney Jamie L. Mauldin filed on July 21, 2023.

61.    It is appropriate that Denton should recover its rate-case expenses incurred in this docket through a separate surcharge of $$0.001604 per kW per month of coincidental peak demand, determined in accordance with 16 TAC § 25.192, over a six-month period.

### *Effective Date*

61A.    The effective date of Denton's wholesale transmission rate is the date of this Order.

## II. Conclusions of Law

The Commission adopts the following conclusions of law.

1. The Commission has authority over this proceeding under PURA §§ 35.004, 35.006, and 40.004(1).

2. Denton is a municipally owned utility as defined in PURA § 11.003(11) and an electric utility as defined in PURA § 35.001 for the purpose of wholesale transmission service.

3. Denton is a TSP as defined in 16 Texas Administrative Code (TAC) § 25.5(141) that provides transmission service as defined in PURA § 31.002(20).

4. The Commission processed the application in accordance with the requirements of PURA, the Administrative Procedure Act,[3] and Commission rules.

5. Denton provided notice of the application in compliance with 16 TAC § 22.55.

6. Denton's application complies with the requirements of 16 TAC § 25.192.

7. Under PURA § 35.004(c) the Commission must ensure that Denton recovers its reasonable costs in providing wholesale transmission service.

8. As a TSP in the ERCOT region, Denton may seek authority to change its transmission rates under 16 TAC § 25.192(g).

9. The return may be determined based on Denton's actual debt service and a reasonable coverage ratio. In determining a reasonable coverage ratio, the Commission will consider the coverage ratios required in Denton's bond indentures or ordinances and the most recent rate action of the rate setting authority for Denton under 16 TAC § 25.192(c)(3).

10. The Commission's modifications to the rate filing package were not a significant change which would invoke the requirements of 16 TAC § 22.80.

11. Laws may not operate retroactively to deprive or impair vested substantive rights acquired under existing laws, or create new obligations, impose new duties, or adopt new disabilities in respect to transactions or considerations past; however, no litigant has a vested right in

---

[3] Tex. Gov't Code §§ 2001.001–.903.

a statute or rule which affects remedy or is procedural in nature and which affects no vested substantive right. Changes in such statutes or rules are considered remedial in nature and have been held not to violate the provisions of Article 1, sec. 16 of the Constitution. *Ex parte Abell*, 613 S.W.2d 255, 260 (Tex. 1981) (citing *Exxon Corp. v. Brecheen*, 526 S.W.2d 519, 525 (Tex. 1975); *Texas Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 649 (Tex. 1971); *Deacon v. City of Euless*, 405 S.W.2d 59, 62 (Tex. 1966).

11A. A DSC ratio of 1.25x for Denton is reasonable under 16 TAC § 25.192(c)(3) for calculating Denton's return on transmission rate base.

12. Texas Government Code § 1502.059 grants the City the authority to make transfers to its general fund from its municipally owned utilities but does not require such transfer to be included in the rates of those utilities.

13. Texas Government Code § 1502.057 explicitly identifies which expenses must be included in Denton's rates and does not include general fund transfers as items that must be included.

14. PURA does not specify any required treatment in wholesale transmission rates of transfers to the City's general fund from its municipally owned utilities' funds.

15. Under 16 TAC § 25.192(e), Denton is required to charge exporting entities for the use of the ERCOT transmission system in exporting power from ERCOT. Subsection (f) of that rule specifies that such revenue must be credited to all transmission customers.

16. Denton did not collect export charges as required by 16 TAC § 25.192.

16A. Denton's post-test-year adjustments to expenses reflect known and measurable changes to historical test-year data under 16 TAC § 25.231(b), (c)(2)(F)(i).

16B. Denton's annual TCOS revenue requirement in the amount of $25,462,927 is reasonable and necessary and calculated in accordance with 16 TAC § 25.192(c).

16C. Denton's transmission-related investment is reasonable and necessary and is used and useful, consistent with the requirements of 16 TAC § 25.192(c).

16D. Denton's annual wholesale transmission rate of $0.35895 per kW per year is properly calculated under 16 TAC § 25.192.

16E. The wholesale transmission rate base additions since Denton's last full TCOS proceeding in Docket No. 30358 have been reconciled in accordance with 16 TAC § 25.192 and were prudently incurred.

16F. Denton's ERCOT export rates approved by this Order comply with 16 TAC § 25.192(e).

16G. The Commission's authority to initiate a rate proceeding for Denton under 16 TAC 25.247 is within the Commission's authority under PURA § 35.004(c) to ensure that a TSP recovers its reasonable costs in providing wholesale transmission service necessary for the transaction.

17. Nothing in 16 TAC 24.247 limits the Commission's authority to initiate a rate proceeding for Denton at any time under Title 16 of the Texas Administrative Code on the basis of other criteria that the Commission determines are in the public interest, including but not limited to the information provided in a non-investor-owned transmission service provider's earnings monitoring report.

18. Denton may recover its reasonable rate-case expenses under PURA § 35.004(c).

### III. Ordering Paragraph

In accordance with these findings of fact and conclusions of law, the Commission issues the following orders.

1. The Commission adopts the proposal for decision, including findings of fact and conclusions of law, to the extent provided in this Order.

2. The Commission approves Denton's TCOS and wholesale transmission rates to the extent provided by this Order.

3. The Commission establishes Denton's annual TCOS revenue requirement as $25,462,927, effective the date of this Order.

4. The Commission establishes Denton's wholesale transmission rate as $0.35895 per kW per year, effective the date of this Order.

5. The Commission establishes Denton's export rates as described in finding of fact number 58J, effective the date of this Order.

6.       Denton must recover $738,327.89 for rate-case expenses incurred from October 1, 2021 through June 30, 2023 in this proceeding through a separate surcharge of $0.001604 per kW per month of coincidental peak demand, determined in accordance with 16 TAC § 25.192, over a six-month period.

7.       Denton must file a report documenting the calculation and collection of the monthly rate-case expense surcharge from customers in compliance with this Order. The filing must be made in a separate docket, *Compliance Filing for Docket No. 52715 (Application of Denton Municipal Electric to Change Wholesale Transmission Service Rates)*, Docket No. 55644.

8.       Denton must file an interim TCOS proceeding no later than 90 days after this Order is filed.

9.       Within ten days of the date this Order is filed, Denton must provide the Commission with a clean copy of the approved wholesale transmission service tariff to be stamped *Approved* and retained by Central Records.

10.     The Commission denies all other motions and any other requests for general or specific relief, if not expressly granted.

Signed at Austin, Texas the ___12th___ day of ___October___ 2023.

PUBLIC UTILITY COMMISSION OF TEXAS

_____
KATHLEEN JACKSON, INTERIM CHAIR

_____
WILL MCADAMS, COMMISSIONER

_____
LORI COBOS, COMMISSIONER

_____
JIMMY GLOTFELTY, COMMISSIONER

Office 16
q:\cadm\orders\final\52000\52715 fo.docx

# APPENDIX C

\*\*\* This document is current through the 2023 Regular Session; the 1st C.S.; the 2nd C.S.; the 3rd C.S. and the 4th C.S. of the 88th Legislature; and the November 7, 2023 general election results. \*\*\*

**Texas Statutes & Codes Annotated by LexisNexis® > Government Code > Title 9 Public Securities (Subts. A — J) > Subtitle J Specific Authority for Municipalities to Issue Securities (Chs. 1501 — 1510) > Chapter 1502 Public Securities for Municipal Utilities, Parks, or Pools (Subchs. A — K) > Subchapter B Public Securities for Utility Systems, Parks, or Pools (§§ 1502.051 — 1502.077)**

## Sec. 1502.059. Transfer of Revenue to General Fund.

Notwithstanding Section 1502.058(a) or a similar law or municipal charter provision, a municipality and its officers and utility trustees may transfer to the municipality's general fund and may use for general or special purposes revenue of any municipally owned utility system in the amount and to the extent authorized in the indenture, deed of trust, or ordinance providing for and securing payment of public securities issued under this chapter or similar law.

## History

Enacted by Acts 1999, 76th Leg., ch. 227 (H.B. 3157), § 1, effective September 1, 1999; am. Acts 1999, 76th Leg., ch. 1064 (H.B. 3224), § 22, effective September 1, 1999 (renumbered from Sec. 1502.061).

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

**End of Document**

# APPENDIX D

# Tex. Gov't Code § 2001.174

*** This document is current through the 2023 Regular Session; the 1st C.S.; the 2nd C.S.; the 3rd C.S. and the 4th C.S. of the 88th Legislature; and the November 7, 2023 general election results. ***

**Texas Statutes & Codes Annotated by LexisNexis® > Government Code > Title 10 General Government (Subts. A — Z) > Subtitle A Administrative Procedure and Practice (Chs. 2001 — 2050) > Chapter 2001 Administrative Procedure (Subchs. A — Z) > Subchapter G Contested Cases: Judicial Review (§§ 2001.171 — 2001.178)**

## Sec. 2001.174. Review Under Substantial Evidence Rule or Undefined Scope of Review.

If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

**(1)** may affirm the agency decision in whole or in part; and

**(2)** shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

**(A)** in violation of a constitutional or statutory provision;

**(B)** in excess of the agency's statutory authority;

**(C)** made through unlawful procedure;

**(D)** affected by other error of law;

**(E)** not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

**(F)** arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

## History

Enacted by Acts 1993, 73rd Leg., ch. 268 (S.B. 248), § 1, effective September 1, 1993.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

# APPENDIX E

*** This document is current through the 2023 Regular Session; the 1st C.S.; the 2nd C.S.; the 3rd C.S. and the 4th C.S. of the 88th Legislature; and the November 7, 2023 general election results. ***

**Texas Statutes & Codes Annotated by LexisNexis® > Local Government Code > Title 13 Water and Utilities (Subts. A — D) > Subtitle A Municipal Water and Utilities (Chs. 401 — 552) > Chapter 552 Municipal Utilities (Subchs. A — Z) > Subchapter A Public Utility Systems in General (§§ 552.001 — 552.003)**

## Sec. 552.001. Municipal Utility Systems; General Powers.

**(a)** In this section, "utility system" means a water, sewer, gas, or electricity system.

**(b)** A municipality may purchase, construct, or operate a utility system inside or outside the municipal boundaries and may regulate the system in a manner that protects the interests of the municipality. The municipality may own land inside or outside its boundaries for these purposes.

**(c)** A municipality may extend the lines of its utility systems outside the municipal boundaries and may sell water, sewer, gas, or electric service to any person outside its boundaries. The municipality may contract with persons outside its boundaries to permit them to connect with those utility systems on terms the municipality considers to be in its best interest. This subsection does not authorize the extension of electric lines into the corporate limits of another municipality.

**(d)** A municipality that owns or operates a utility system may prescribe the kind of water or gas mains, sewer pipes, and electric appliances that may be used inside or outside the municipality. The municipality may inspect those facilities and appliances, require that they be kept in good condition at all times, and prescribe the necessary rules, which may include penalties, concerning them.

## History

Enacted by Acts 1987, 70th Leg., ch. 149 (S.B. 896), § 1, effective September 1, 1987; am. Acts 2007, 80th Leg., ch. 885 (H.B. 2278), § 3.76(a)(2), effective April 1, 2009 (renumbered from Section 402.001).

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

# APPENDIX F

# Tex. Utilities Code § 15.001

*** This document is current through the 2023 Regular Session; the 1st C.S.; the 2nd C.S.; the 3rd C.S. and the 4th C.S. of the 88th Legislature; and the November 7, 2023 general election results. ***

**Texas Statutes & Codes Annotated by LexisNexis® > Utilities Code > Title 2 Public Utility Regulatory Act (Subts. A — C) > Subtitle A Provisions Applicable to All Utilities (Chs. 11 — 30) > Chapter 15 Judicial Review, Enforcement, and Penalties (Subchs. A — D) > Subchapter A Judicial Review (§§ 15.001 — 15.004)**

## Sec. 15.001. Right to Judicial Review.

Any party to a proceeding before the commission is entitled to judicial review under the substantial evidence rule.

## History

Enacted by Acts 1997, 75th Leg., ch. 166 (S.B. 1751), § 1, effective September 1, 1997.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

---

**End of Document**

# APPENDIX G

# Tex. Utilities Code § 31.001

*** This document is current through the 2023 Regular Session; the 1st C.S.; the 2nd C.S.; the 3rd C.S. and the 4th C.S. of the 88th Legislature; and the November 7, 2023 general election results. ***

**Texas Statutes & Codes Annotated by LexisNexis® > Utilities Code > Title 2 Public Utility Regulatory Act (Subts. A — C) > Subtitle B Electric Utilities [Expires September 1, 2023] (Chs. 31 — 50) > Chapter 31 General Provisions (Subchs. A — B) > Subchapter A General Provisions (§§ 31.001 — 31.005)**

## Sec. 31.001. Legislative Findings; Purpose of Subtitle.

**(a)** This subtitle is enacted to protect the public interest inherent in the rates and services of electric utilities. The purpose of this subtitle is to establish a comprehensive and adequate regulatory system for electric utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the electric utilities.

**(b)** Electric utilities are by definition monopolies in many of the services provided and areas they serve. As a result, the normal forces of competition that regulate prices in a free enterprise society do not always operate. Public agencies regulate electric utility rates, operations, and services, except as otherwise provided by this subtitle.

**(c)** The wholesale electric industry, through federal legislative, judicial, and administrative actions, is becoming a more competitive industry that does not lend itself to traditional electric utility regulatory rules, policies, and principles. As a result, the public interest requires that rules, policies, and principles be formulated and applied to protect the public interest in a more competitive marketplace. The development of a competitive wholesale electric market that allows for increased participation by electric utilities and certain nonutilities is in the public interest.

## History

Enacted by Acts 1997, 75th Leg., ch. 166 (S.B. 1751), § 1, effective September 1, 1997.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

# APPENDIX H

*** This document is current through the 2023 Regular Session; the 1st C.S.; the 2nd C.S.; the 3rd C.S. and the 4th C.S. of the 88th Legislature; and the November 7, 2023 general election results. ***

**Texas Statutes & Codes Annotated by LexisNexis®  >  Utilities Code  >  Title 2 Public Utility Regulatory Act (Subts. A — C)  >  Subtitle B Electric Utilities [Expires September 1, 2023] (Chs. 31 — 50)  >  Chapter 35 Energy Providers (Subchs. A — E)  >  Subchapter A Competition and Transmission Access In the Wholesale Market (§§ 35.001 — 35.010)**

## Notice

⚑ This section has more than one version with varying effective dates.

## Sec. 35.004. Provision of Transmission Service.

**(a)**  An electric utility or transmission and distribution utility that owns or operates transmission facilities shall provide wholesale transmission service at rates and terms, including terms of access, that are comparable to the rates and terms of the utility's own use of its system.

**(b)**  The commission shall ensure that an electric utility or transmission and distribution utility provides nondiscriminatory access to wholesale transmission service for qualifying facilities, exempt wholesale generators, power marketers, power generation companies, retail electric providers, and other electric utilities or transmission and distribution utilities.

**(c)**  When an electric utility, electric cooperative, or transmission and distribution utility provides wholesale transmission service within ERCOT at the request of a third party, the commission shall ensure that the utility recovers the utility's reasonable costs in providing wholesale transmission services necessary for the transaction from the entity for which the transmission is provided so that the utility's other customers do not bear the costs of the service.

**(d)**  The commission shall price wholesale transmission services within ERCOT based on the postage stamp method of pricing under which a transmission-owning utility's rate is based on the ERCOT utilities' combined annual costs of transmission, other than costs described by Subsections (d-2) and (d-3), divided by the total demand placed on the combined transmission systems of all such transmission-owning utilities within a power region. An electric utility subject to the freeze period imposed by Section 39.052 may treat transmission costs in excess of transmission revenues during the freeze period as an expense for purposes of determining annual costs in the annual report filed under Section 39.257. Notwithstanding Section 36.201, the commission may approve wholesale

rates that may be periodically adjusted to ensure timely recovery of transmission investment. Notwithstanding Section 36.054(a), if the commission determines that conditions warrant the action, the commission may authorize the inclusion of construction work in progress in the rate base for transmission investment required by the commission under Section 39.203(e).

**(d-1)**The commission by rule shall establish a reasonable allowance for transmission-owning utility costs incurred to interconnect generation resources directly with the ERCOT transmission system at transmission voltage. The allowance must take into account:

> **(1)** the potential to reduce the costs to consumers of generation interconnection;
>
> **(2)** historical generation interconnection costs; and
>
> **(3)** any other factor that the commission considers reasonable to accomplish the goal of this subsection.

**(d-2)**Costs in excess of the transmission-owning utility allowance provided by Subsection (d-1) incurred to interconnect generation resources with the ERCOT transmission system must be directly assigned to and collected from the generation resource interconnecting through the facilities.

**(d-3)**Not later than September 1 of every fifth year, the commission shall review and may adjust the allowance provided by Subsection (d-1) to account for inflation or supply chain issues.

**(e)** In this section, "ancillary services" means services necessary to facilitate the transmission of electric energy including load following, standby power, backup power, reactive power, and any other services as the commission may determine by rule.

**(f)** The commission shall ensure that ancillary services necessary to facilitate the transmission of electric energy are available at reasonable prices with terms and conditions that are not unreasonably preferential, prejudicial, discriminatory, predatory, or anticompetitive. On the introduction of customer choice in the ERCOT power region, acquisition of generation-related ancillary services on a nondiscriminatory basis by the independent organization in ERCOT on behalf of entities selling electricity at retail shall be deemed to meet the requirements of this subsection.

**(g)** The commission shall:

> **(1)** review the type, volume, and cost of ancillary services to determine whether those services will continue to meet the needs of the electricity market in the ERCOT power region; and
>
> **(2)** evaluate whether additional services are needed for reliability in the ERCOT power region while providing adequate incentives for dispatchable generation.

**(h)** The commission shall require the independent organization certified under Section 39.151 for the ERCOT power region to modify the design, procurement, and cost allocation of ancillary services for the region in a manner consistent with cost-causation principles and on a nondiscriminatory basis.

## History

Enacted by Acts 1997, 75th Leg., ch. 166 (S.B. 1751), § 1, effective September 1, 1997; am. Acts 1999, 76th Leg., ch. 405 (S.B. 7), § 17, effective September 1, 1999; am. Acts 2003, 78th Leg., ch. 295 (H.B. 2548), § 1, effective June 18, 2003; Acts 2021, 87th Leg., ch. 426 (S.B. 3), § 14, effective June 8, 2021; Acts 2023, 88th Leg., ch. 410 (H.B. 1500), § 9, effective September 1, 2023.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

**End of Document**

# APPENDIX I

*** This document is current through the 2023 Regular Session; the 1st C.S.; the 2nd C.S.; the 3rd C.S. and the 4th C.S. of the 88th Legislature; and the November 7, 2023 general election results. ***

**Texas Statutes & Codes Annotated by LexisNexis®  >  Utilities Code  >  Title 2 Public Utility Regulatory Act (Subts. A — C)  >  Subtitle B Electric Utilities [Expires September 1, 2023] (Chs. 31 — 50)  >  Chapter 36 Rates (Subchs. A — J)  >  Subchapter D Rate Changes Proposed By Regulatory Authority (§§ 36.151 — 36.157)**

## Sec. 36.157. Rate Review Schedule.

**(a)** This section applies only to an electric utility, other than a river authority, that operates solely inside ERCOT.

**(b)** Notwithstanding any other provision of this title, not later than June 1, 2018, the commission by rule shall establish a schedule that requires an electric utility to make periodic filings with the commission to modify or review base rates charged by the electric utility. The schedule may be established on the basis of:

**(1)** the period since the commission entered the commission's final order in the electric utility's most recent base rate proceeding;

**(2)** whether the electric utility has earned materially more than the utility's authorized rate of return on equity as demonstrated by earnings monitoring reports; or

**(3)** other criteria that the commission determines is in the public interest.

**(c)** The commission shall extend the date for the proceeding required by Subsection (b) by one year on a year-to-year basis if, 180 days before the date the proceeding is required, the electric utility's most recent earnings monitoring report shows the electric utility is earning, on a weather-normalized basis, less than 50 basis points above:

**(1)** for a transmission and distribution utility, the average of the most recent commission-approved rate of return on equity for each transmission and distribution utility with 175,000 or more metered customers; and

**(2)** for a transmission-only utility, the average of the most recent commission-approved rate of return on equity for each transmission-only utility.

**(d)** The commission may extend the date for the proceeding required by Subsection (b) for good cause shown or because of resource constraints of the commission.

**(e)** This section does not limit the ability of a regulatory authority to initiate a base rate proceeding at any time under this title.

## History

2017, 85th Leg., S.B. 735, § 1, effective May 27, 2017.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

---

**End of Document**

# APPENDIX J

# Tex. Utilities Code § 40.004

\*\*\* This document is current through the 2023 Regular Session; the 1st C.S.; the 2nd C.S.; the 3rd C.S. and the 4th C.S. of the 88th Legislature; and the November 7, 2023 general election results. \*\*\*

**Texas Statutes & Codes Annotated by LexisNexis®  >  Utilities Code  >  Title 2 Public Utility Regulatory Act (Subts. A — C)  >  Subtitle B Electric Utilities [Expires September 1, 2023] (Chs. 31 — 50)  >  Chapter 40 Competition for Municipally Owned Utilities and River Authorities (Subchs. A — C)  >  Subchapter A General Provisions (§§ 40.001 — 40.004)**

## Sec. 40.004. Jurisdiction of Commission.

Except as specifically otherwise provided in this chapter, the commission has jurisdiction over municipally owned utilities only for the following purposes:

**(1)** to regulate wholesale transmission rates and service, including terms of access, to the extent provided by Subchapter A, Chapter 35;

**(2)** to regulate certification of retail service areas to the extent provided by Chapter 37;

**(3)** to regulate rates on appeal under Subchapters D and E, Chapter 33, subject to Section 40.051(c);

**(4)** to establish a code of conduct as provided by Section 39.157(e) applicable to anticompetitive activities and to affiliate activities limited to structurally unbundled affiliates of municipally owned utilities, subject to Section 40.054;

**(5)** to establish terms and conditions for open access to transmission and distribution facilities for municipally owned utilities providing customer choice, as provided by Section 39.203;

**(6)** to administer the natural gas energy credits program under Section 39.9044(b);

**(7)** to require reports of municipally owned utility operations only to the extent necessary to:

**(A)** enable the commission to determine the aggregate load and energy requirements of the state and the resources available to serve that load; or

**(B)** enable the commission to determine information relating to market power as provided by Section 39.155; and

**(8)** to evaluate and monitor the cybersecurity preparedness of a municipally owned utility described by Section 39.1516(a)(3) or (4).

## History

Enacted by Acts 1999, 76th Leg., ch. 405 (S.B. 7), § 39, effective September 1, 1999; Acts 2019, 86th Leg., ch. 467 (H.B. 4170), § 16.005, effective September 1, 2019; Acts 2019, 86th Leg., ch. 610 (S.B. 936), § 9, effective September 1, 2019; Acts 2023, 88th Leg., ch. 410 (H.B. 1500), § 42, effective September 1, 2023.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

**End of Document**

# APPENDIX K

# 16 TAC § 25.192

This document reflects all regulations in effect as of April 30, 2025

TX - Texas Administrative Code    >    TITLE 16. ECONOMIC REGULATION    > PART 2. PUBLIC UTILITY COMMISSION OF TEXAS    >    CHAPTER 25. SUBSTANTIVE RULES APPLICABLE TO ELECTRIC SERVICE PROVIDERS    >    SUBCHAPTER I. TRANSMISSION AND DISTRIBUTION    >    DIVISION 1. OPEN-ACCESS COMPARABLE TRANSMISSION SERVICE FOR ELECTRIC UTILITIES IN THE ELECTRIC RELIABILITY COUNCIL OF TEXAS

## § 25.192. Transmission Rates for Export from ERCOT

**(a)** Tariffs. Each transmission service provider (TSP) shall file a tariff for transmission service to establish its rates and other terms and conditions and shall apply its tariffs and rates on a non-discriminatory basis. The tariff shall apply to all distribution service providers (DSPs) and any entity scheduling the export of power from the Electric Reliability Council of Texas (ERCOT) region. The tariff shall not apply to any entity engaging in wholesale storage as described by § 25.501(m) of this title (relating to Wholesale Market Design for the Electric Reliability Council of Texas) (storage entity).

**(b)** Charges for transmission service delivered within ERCOT. DSPs, excluding storage entities, shall incur transmission service charges pursuant to the tariffs of the TSP.

  **(1)** A TSP's transmission rate shall be calculated as its commission-approved transmission cost of service divided by the average of ERCOT coincident peak demand for the months of June, July, August and September (4CP), excluding the portion of coincident peak demand attributable to wholesale storage load. A TSP's transmission rate shall remain in effect until the commission approves a new rate. The TSP's annual rate shall be converted to a monthly rate. The monthly transmission service charge to be paid by each DSP is the product of each TSP's monthly rate as specified in its tariff and the DSP's previous year's average of the 4CP demand that is coincident with the ERCOT 4CP.

  **(2)** Payments for transmission services shall be consistent with commission orders, approved tariffs, and § 25.202 of this title (relating to Commercial Terms for Transmission Service).

**(c)** Transmission cost of service. The transmission cost of service for each TSP shall be based on the expenses in Federal Energy Regulatory Commission (FERC) expense accounts 560-573 (or accounts with similar contents or amounts functionalized to the transmission function) plus the depreciation, federal income tax, and other associated taxes, and the commission-allowed rate of return based on FERC plant accounts 350-359 (or accounts with similar contents or amounts functionalized to the transmission function), less accumulated depreciation and accumulated deferred federal income taxes, as applicable.

**(1)** The following facilities are deemed to be transmission facilities:

**(A)** power lines, substations, reactive devices, and associated facilities, operated at 60 kilovolts or above, including radial lines operated at or above 60 kilovolts, except the step-up transformers and a protective device associated with the interconnection from a generating station to the transmission network;

**(B)** substation facilities on the high side of the transformer, in a substation where power is transformed from a voltage higher than 60 kilovolts to a voltage lower than 60 kilovolts;

**(C)** the portion of the direct-current interconnections with areas outside of the ERCOT region (DC ties) that are owned by a TSP in the ERCOT region, including those portions of the DC tie that operate at a voltage lower than 60 kilovolts; and

**(D)** capacitors and other reactive devices that are operated at a voltage below 60 kilovolts, if they are located in a distribution substation, the load at the substation has a power factor in excess of 0.95 as measured or calculated at the distribution voltage level without the reactive devices, and the reactive devices are controlled by an operator or automatically switched in response to transmission voltage.

**(E)** As used in subparagraphs (A) - (D) of this paragraph, reactive devices do not include generating facilities.

**(2)** For municipally owned utilities, river authorities, and electric cooperatives, the commission may permit the use of the cash flow method or other reasonable alternative methods of determining the annual transmission revenue requirement, including the return element of the revenue requirement, consistent with the rate actions of the rate-setting authority for a municipally owned utility.

**(3)** For municipally owned utilities, river authorities, and electric cooperatives, the return may be determined based on the TSP's actual debt service and a reasonable coverage ratio. In determining a reasonable coverage ratio, the commission will consider the coverage ratios required in the TSP's bond indentures or ordinances and the most recent rate action of the rate setting authority for the TSP.

**(4)** A municipally owned utility that is required to apply for a certificate of public convenience and necessity to construct, install, or extend a transmission facility within ERCOT pursuant to § 25.101 of this title (relating to Certification Criteria) is entitled to recover, through the utility's wholesale transmission rate, reasonable payments made to a taxing entity in lieu of ad valorem taxes on that transmission facility, provided that:

**(A)** The utility enters into a written agreement with the governing body of the taxing entity related to the payments;

**(B)** The amount paid is the same as the amount the utility would have to pay to the taxing entity on that transmission facility if the facility were subject to ad valorem taxation;

**(C)** The governing body of the taxing entity is not the governing body of the utility; and

**(D)** The utility provides the commission with a copy of the written agreement and any other information that the commission considers necessary in relation to the agreement.

**(5)** The commission may adopt rate-filing requirements that provide additional details concerning the costs that may be included in the transmission costs and how such costs should be reported in a proceeding to establish transmission rates.

**(d)** Billing units. No later than December 1 of each year, ERCOT shall determine and file with the commission the current year's average 4CP demand for each DSP, or the DSP's agent for transmission service billing purposes, as appropriate, excluding the portion of coincident peak demand attributable to wholesale storage load. This demand shall be used to bill transmission service for the next year. The ERCOT average 4CP demand shall be the sum of the coincident peak of all of the ERCOT DSPs, excluding the portion of coincident peak demand attributable to wholesale storage load, for the four intervals coincident with ERCOT system peak for the months of June, July, August, and September, divided by four. As used in this section, a DSP's average 4CP demand is determined from the total demand, coincident with the ERCOT 4CP, of all customers connected to a DSP, including load served at transmission voltage, but excluding the load of wholesale storage entities. The measurement of the coincident peak shall be in accordance with commission-approved ERCOT protocols.

**(e)** Transmission rates for exports from ERCOT. A transmission service charge for exports of power from ERCOT must be assessed to transmission service customers for transmission service within the boundaries of the ERCOT region, in accordance with this section and the ERCOT protocols.

**(1)** A transmission service customer must be assessed a transmission service charge for the use of the ERCOT transmission system in exporting power from ERCOT based on scheduled exports and the rates established under subsections (c) and (d) of this section. The intervals must consist of one hour.

**(2)** The hourly transmission rate for exports from ERCOT will be the TSP's annual rate established under subsections (c) and (d) of this section divided by 8760.

**(3)** The entity scheduling the export of power over a DC tie is solely responsible to the TSP for payment of transmission service charges under this subsection.

**(4)** Beginning with the January 2023 reporting month, ERCOT must file a public report with the commission stating the total amount of energy imported and the total amount of energy exported over each DC tie for the calendar month. The report must also include the total amount of energy exported from the ERCOT region during the reporting month and each of the preceding 11 calendar months, reported by scheduling entity. Each report must be filed within 45 days of the end of the reporting month.

**(f)** Transmission revenue. Revenue from the transmission of electric energy out of the ERCOT region over the DC ties that is recovered under subsection (e) of this section shall be credited to all transmission service customers as a reduction in the transmission cost of service for TSPs that receive the revenue.

**(g)** Revision of transmission rates. Each TSP in the ERCOT region shall periodically revise its transmission service rates to reflect changes in the cost of providing such services. Any request for a change in transmission rates shall comply with the filing requirements established by the commission under this section.

**(h)** Interim Update of Transmission rates.

**(1)** Frequency. Each TSP in the ERCOT region may apply to update its transmission rates on an interim basis not more than once per calendar year to reflect changes in its invested capital. Upon the effective date of an amendment to § 25.193 pursuant to an order in Project Number 37909, Rulemaking Proceeding to Amend P.U.C. Subst. R. 25.193, Relating to Distribution Service Provider Transmission Cost Recovery factors (TCRF), that allows a distribution service provider to recover, through its transmission cost recovery factor, all transmission costs charged to the distribution service provider by TSPs, each TSP in the ERCOT region may apply to update its transmission rates on an interim basis not more than twice per calendar year to reflect changes in its invested capital. If the TSP elects to update its transmission rates, the new rates shall reflect the addition and retirement of transmission facilities and include appropriate depreciation, federal income tax and other associated taxes, and the commission authorized rate of return on such facilities as well as changes in loads. If the TSP does not have a commission-authorized rate of return, an appropriate rate of return shall be used.

**(2)** Reconciliation. An update of transmission rates under paragraph (1) of this subsection shall be subject to reconciliation at the next complete review of the TSP's transmission cost of service, at which time the commission shall review the costs of the interim transmission plant additions to determine if they were reasonable and necessary. Any amounts resulting from an update that are found to have been unreasonable or unnecessary, plus the corresponding return and taxes, shall be refunded with carrying costs determined as follows: for the time period beginning with the date on which over-recovery is determined to have begun to the effective date of the TSP's rates set in that complete review of the TSP's transmission cost of service, carrying costs shall be calculated using the same rate of return that was applied to the transmission investments included in the update. For the time period beginning with the effective date of the TSP's rates set in that complete review of the TSP's transmission cost of service, carrying costs shall be calculated using the TSP's rate of return authorized in that complete review.

**(3)** Future consideration of effect on TSP's financial risk and rate of return. For a TSP that has increased its rates pursuant to paragraph (1) of this subsection, the commission may, in setting rates in the next complete review of the TSP's transmission cost of service, expressly consider the effects of reduced regulatory lag resulting from the interim updates to the TSP's rates and the concomitant impact on the TSP's financial risk and rate of return.

**(4)** Commission processing of application. The commission shall process an application filed pursuant to paragraph (1) of this subsection in the following manner.

**(A)** Notice and intervention deadline. The applicant shall provide notice of its application to all parties in the applicant's last complete review of the applicant's transmission cost of service and all of the distribution service providers listed in the last docket in which the commission set the annual transmission service charges for the Electric Reliability Council of Texas. The intervention deadline shall be 21 days from the date service of notice is completed.

**(B)** Sufficiency of application. A motion to find an application materially deficient shall be filed no later than 21 days after an application is filed. The motion shall be served on the applicant by hand delivery, facsimile transmission, or overnight courier delivery, or by e-mail if agreed to by the applicant or ordered by the presiding officer. The motion shall specify the nature of the deficiency and the relevant portions of the application, and cite the particular requirement with which the application is alleged not to comply. The applicant's response to a motion to find an application materially deficient shall be filed no later than five working days after such motion is received. If within ten working days after the deadline for filing a motion to find an application materially deficient, the presiding officer has not filed a written order concluding that material deficiencies exist in the application, the application is deemed sufficient.

**(C)** Review of application. A proceeding initiated pursuant to paragraph (1) of this subsection is eligible for disposition pursuant to § 22.35(b)(1) of this title (relating to Informal Disposition). If the requirements of § 22.35 of this title are met, the presiding officer shall issue a notice of approval within 60 days of the date a materially sufficient application is filed unless good cause exists to extend this deadline or the presiding officer determines that the proceeding should be considered by the commission.

**(5)** Filing Schedule. The commission may prescribe a schedule for providers of transmission services to file proceedings to revise the rates for such services.

**(6)** DSP's right to pass through changes in wholesale rates. A DSP may expeditiously pass through to its customers changes in wholesale transmission rates approved by the commission, pursuant to § 25.193 of this title (relating to Distribution Service Provider Transmission Cost Recovery Factors (TCRF)).

**(7)** Reporting requirements. TSPs shall file reports that will permit the commission to monitor their transmission costs and revenues, in accordance with any filing requirements and schedules prescribed by the commission.

## History

**SOURCE:**

 The provisions of this § 25.192 adopted to be effective April 13, 1999, 24 TexReg 2874; amended to be effective September 30, 1999, 24 TexReg 8162; amended to be effective December 29, 1999, 24 TexReg 11722; amended to be effective June 20, 2001, 26 TexReg 4440; amended to be effective August 25, 2010, 35 TexReg 7195; amended to be effective April

18, 2012, 37 TexReg 2613; amended to be effective July 5, 2016, 41 TexReg 4805; amended to be effective December 20, 2022, 47 TexReg8267

Annotations

## Research References & Practice Aids

**CROSS-REFERENCES:**

This Section cited in 16 TAC § 25.193, (relating to Procedures for Modifying Transmission Rates); 16 TAC § 25.198, (relating to Initiating Transmission Service); 16 TAC § 25.200, (relating to Load Shedding, Curtailments, and Redispatch); 16 TAC § 25.204, (relating to Summary of Required Filings); 16 TAC § 25.344, (relating to Cost Separation Proceedings); 16 TAC § 25.247, (relating to Rate Review Schedule).

This Chapter cited in 16 TAC § 25.2, (relating to Cross-Reference Transition Provision); 16 TAC § 26.2, (relating to Cross-Reference Transition Provision).

This Subchapter cited in 16 TAC § 25.242, (relating to Arrangements Between Qualifying Facilities and Electric Utilities).

TEXAS ADMINISTRATIVE CODETEXAS ADMINISTRATIVE CODE

**End of Document**

# APPENDIX L

# 16 TAC § 25.247

This document reflects all regulations in effect as of April 30, 2025

**TX - Texas Administrative Code** > **TITLE 16. ECONOMIC REGULATION** > **PART 2. PUBLIC UTILITY COMMISSION OF TEXAS** > **CHAPTER 25. SUBSTANTIVE RULES APPLICABLE TO ELECTRIC SERVICE PROVIDERS** > **SUBCHAPTER J. COSTS, RATES AND TARIFFS** > **DIVISION 1. RETAIL RATES**

## § 25.247. Rate Review Schedule

**(a)** Application. This section applies to investor-owned electric utilities and non-investor-owned transmission service providers operating inside the Electric Reliability Council of Texas (ERCOT).

**(b)** Filing requirements for investor-owned electric utilities.

**(1)** Each investor-owned electric utility in the ERCOT region must file for a comprehensive rate review within 48 months of the order setting rates in its most recent comprehensive rate proceeding or other proceeding in which the commission approved a settlement agreement reflecting a rate modification that allowed the electric utility to avoid the filing of such a rate case. For an investor-owned transmission and distribution utility, the filing must include information necessary for the review of both transmission and distribution rates.

**(2)** On a year-to-year basis, the commission shall issue an order extending the filing requirements under paragraph (1) of this subsection by one year if the following conditions are met:

**(A)** for an investor-owned electric utility providing transmission-only service, the utility's most recent earnings monitoring report, as of 180 days before its scheduled filing date established by this section, filed in compliance with commission rules and instructions or as adjusted by the commission to conform with the rules and instructions, shows that it is earning, on a weather-normalized basis using weather data for the most recent ten calendar years, less than 50 basis points above the average of the most recent commission-approved rate of return on equity for each investor-owned transmission-only utility operating in ERCOT; or

**(B)** for an investor-owned transmission and distribution utility, the utility's most recent earnings monitoring report, as of 180 days before its scheduled filing date established by this section, filed in compliance with commission rules and instructions or as adjusted by the commission to conform with the rules and instructions, shows that it is earning, on a weather-normalized basis using weather data for the most recent ten calendar years, less than 50 basis points above the average of the most recent commission-approved rate of return on equity for each

investor-owned transmission and distribution utility operating in ERCOT with at least 175,000 metered customers.

**(3)** The commission may extend the scheduled filing deadline under paragraphs (1) and (2) of this subsection for good cause shown or because of resource constraints of the commission.

**(4)** An investor-owned electric utility qualifying for an extension under paragraph (2) of this subsection shall submit notice in the same project as the filing of its most recent earnings monitoring report at least 180 days before the fourth anniversary of the order in its most recent comprehensive rate proceeding or other proceeding in which the commission approved a settlement agreement reflecting a rate modification that allowed the electric utility to avoid the filing of such a rate case.

**(5)** Nothing in this section limits the commission's authority to initiate a rate proceeding at any time under this title on the basis of other criteria that the commission determines are in the public interest, including but not limited to the information provided in an investor-owned electric utility's earnings monitoring report.

**(c)** Transition issues for investor-owned electric utilities.

**(1)** If an investor-owned electric utility has a comprehensive rate proceeding pending on the effective date of this rule, the electric utility is required to file, after the commission's final order in that pending proceeding, a comprehensive rate proceeding in accordance with subsection (b) of this section. If the pending proceeding is withdrawn, dismissed, or otherwise resolved without a final order, the investor-owned electric utility shall be subject to the transition timelines in paragraph (2) of this subsection unless the commission orders otherwise.

**(2)** All investor-owned electric utilities shall make their initial filings under subsection (b) of this section on or before the later of:

**(A)** 48 months from the order in the investor-owned electric utility's last comprehensive rate proceeding or other proceeding in which the commission approved a settlement agreement reflecting a rate modification that allowed the electric utility to avoid the filing of such a rate case; or

**(B)** the following dates:

Display Image

**(d)** Filing requirements for non-investor-owned transmission service providers.

**(1)** After complying with applicable provisions under subsection (e) of this section, and on an ongoing basis thereafter, each non-investor-owned transmission service provider is required to submit a complete application for either a comprehensive transmission cost of service review under § 25.192(g) of this title (relating to Transmission Service Rates) or an interim update under § 25.192(h) of this title within:

**(A)** 48 months of the date of the provider's order for its most recently approved change in transmission service rates under § 25.192 of this title if the provider's approved wholesale transmission service revenue requirement is equal to or

greater than one percent of the amount of the total ERCOT wholesale transmission charges determined by the commission in the most recent annual update, as of the date of the provider's order, of the ERCOT four coincident peak (4CP) demand in accordance with § 25.192(b) of this title; or

**(B)** 96 months of the date of the provider's order for its most recently approved change in transmission service rates under § 25.192 of this title if the provider's approved wholesale transmission service revenue requirement is less than one percent of the amount of the total ERCOT wholesale transmission charges determined by the commission in the most recent annual update, as of the date of the provider's order, of the ERCOT four coincident peak (4CP) demand in accordance with § 25.192(b) of this title.

**(2)** Nothing in this section limits the commission's authority to initiate a rate proceeding at any time under this title on the basis of other criteria that the commission determines are in the public interest, including but not limited to the information provided in a non-investor-owned transmission service provider's earnings monitoring report.

**(e)** Transition period for filings by non-investor-owned transmission service providers. As of the effective date of this subsection, for a non-investor-owned transmission service provider that has not since January 1, 2017, had a commission-approved change to its transmission service rates under § 25.192 of this title or does not have a rate proceeding pending under § 25.192 of this title, the following deadlines apply for submitting a complete application for either a comprehensive transmission cost of service review under § 25.192(g) of this title or a complete application for an interim update under § 25.192(h) of this title:

Display Image

# History

### SOURCE:

The provisions of this § 25.247 adopted to be effective May 6, 2018, 43 TexReg 2763; amended to be effective November 28, 2018, 43 TexReg 7672

Annotations

# Research References & Practice Aids

### CROSS-REFERENCES:

This Chapter cited in 16 TAC § 25.2, (relating to Cross-Reference Transition Provision); 16 TAC § 26.2, (relating to Cross-Reference Transition Provision).

TEXAS ADMINISTRATIVE CODE

**End of Document**

# APPENDIX M

| THE CITY OF DENTON, | § | IN THE DISTRICT COURT OF |
|---|---|---|
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| PETER LAKE, CHAIRMAN, | § | |
| WILL MCADAMS, | § | |
| COMMISSIONER, LORI COBOS, | § | |
| COMMISSIONER, KATHLEEN | § | |
| JACKSON, COMMISSIONER | § | |
| AND JIMMY GLOTFELTY, | § | |
| COMMISSIONER, EACH IN HIS | § | TRAVIS COUNTY, TEXAS |
| OR HER OFFICIAL CAPACITY | § | |
| AT THE PUBLIC UTILITY | § | |
| COMMISSION OF TEXAS, AND | § | |
| ADMINISTRATIVE LAW JUDGE | § | |
| DANIEL WISEMAN AND | § | |
| ADMINISTRATIVE LAW JUDGE | § | |
| LINDA BRITE, EACH IN THEIR | § | |
| OFFICIAL CAPACITY AT THE | § | |
| STATE OFFICE OF | § | |
| ADMINISTRATIVE HEARINGS, | § | |
| | § | |
| *Defendants.* | § | 200TH JUDICIAL DISTRICT |

## FINAL JUDGMENT AND
## ORDER GRANTING PERMANENT INJUNCTION

On this day came before the Court the Petition and Application for Permanent Injunction of the City of Denton (the "City"), operating its municipally owned electric utility as Denton Municipal Electric ("DME"). After notice to all parties, on April 3, 2023, the Court conducted a trial on the merits on the City's Petition for Declaratory Judgment and Application for Permanent Injunction, as well as a hearing on the City's Motion for Summary Judgment and the cross-Motions for Summary Judgment filed by the PUC Officials and the Office of Public Utility Counsel, including all

Responses and Replies to same. Having considered all of the documents and pleadings on file in this case, the evidence presented, and the arguments of counsel, the Court determined that the Defendants, Peter Lake, Chairman, Will McAdams, Commissioner, Lori Cobos, Commissioner, Kathleen Jackson, Commissioner, and Jimmy Glotfelty, Commissioner, (collectively, "Defendants") acted ultra vires in attempting to set interim rates in connection with PUC Docket No. 52715 and SOAH Docket No. 473-22-07688. The City has carried its burden and the Court finds that if Defendants are not restrained from taking the actions listed specifically herein, the City would be irreparably harmed and would suffer probable imminent and irreparable injury.

Specifically, the Court finds that the Commissioners, in denying the City's appeal of SOAH Order No. 5 in SOAH Docket No. 473-22-07688 and PUC Docket No. 52715 and determining that the PUC is authorized to set "interim rates" in connection with a comprehensive wholesale TCOS proceeding for a MOU, have acted outside of their legal authority. The PUC Commissioners have expressed intent to set and impose "interim rates" on the City's wholesale transmission service. In ordering SOAH ALJs to set "interim rates," the PUC Commissioners have expressed clear intent to establish a rate for a MOU in a comprehensive TCOS proceeding prior to an ultimate determination of just and reasonable rate. Allowing an "interim" rate change that circumvents the ultimate determination that should apply to this application process is a collateral attack on the prior determination of a just and reasonable rate. There was no appeal or petition for judicial review of that prior order

2

in PUC Docket No. 30358, which has been final and in effect since 2005. This "interim rate" process, which does not come at the conclusion of all of the steps for a comprehensive TCOS application is not a new determination; it is an untimely and unlawful attempt to circumvent the correct statutory mechanisms and change the existing, PUC approved rate.

In addition, the Court finds that if Defendants are not restrained from taking the actions listed specifically herein, the City's financial standing and credit would be imminently and irreparably harmed. Once the City changes its rates to the interim rates and submits and collects on invoices pursuant to those rates, there is no discernable way under the circumstances to again amend or correct those rates, including later "correction" of invoices issued under the interim rates to reconcile or true-up the amount collected to reflect the actual lawful rate.

The Court further finds that the Commissioners of the Public Utility Commission of Texas, Peter Lake, Will McAdams, Lori Cobos, Kathleen Jackson, and Jimmy Glotfelty (together, "the Commissioners"), acting in their official capacity, do not have the legal authority to set or impose "interim rates" during the pendency of a comprehensive TCOS case filed pursuant to 16 TAC § 25.192(c). The Court further finds that the Commissioners therefore do not have the legal authority to set or impose "interim rates" as ordered in PUC Order on Interim Appeal of SOAH Order No. 5 and SOAH Order No. 12 in the comprehensive TCOS case filed by DME pending as SOAH Docket No. 473-22-07688 and PUC Docket No. 52715.

3

The Court further finds that if the Defendants are not restrained from taking the actions listed specifically herein, the City will be immediately and irreparably harmed by being subjected to an order that exceeds the Commissioners' legal authority and being required to charge a rate for wholesale transmission services that has not been set pursuant to any applicable state law.

The Court concludes further that the City does not have an adequate remedy at law for the imminent and irreparable injuries that it would suffer in the event Defendants take the actions restrained herein.

After considering the written instruments on file, and the arguments and presentation at the trial on the merits, the Court is of the opinion that declaratory judgment against Defendants, Peter Lake, Chairman, Will McAdams, Commissioner, Lori Cobos, Commissioner, Kathleen Jackson, Commissioner, and Jimmy Glotfelty, Commissioner, is proper and should be, and therefore is, GRANTED. The Pleas to the Jurisdiction of the PUC Commissioners is hereby DENIED.

It is therefore ordered that:

- State law, including Chapters 35 and 36 of PURA, does not allow for the imposition of interim rates by the PUC against MOUs in comprehensive TCOS filings made pursuant to 16 TAC § 25.192(c);

- In setting or ordering the setting of an interim rate as to DME's TCOS in DME's comprehensive TCOS proceeding, the PUC's Commissioners have acted outside their legal authority granted to them under state law including PURA.

4

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that Defendants, Peter Lake, Chairman, Will McAdams, Commissioner, Lori Cobos, Commissioner, Kathleen Jackson, Commissioner, and Jimmy Glotfelty, Commissioner, or any other persons acting in those official capacities on behalf of the Public Utility Commission of Texas, are hereby PERMANENTLY ENJOINED from ordering or implementing "interim rates" applicable to DME's TCOS during the pendency of the City's comprehensive TCOS case in PUC Docket No. 52715 and SOAH Docket No. 473-22-07688.

This Order is necessary to prevent imminent and irreparable injury to the City.

This Order is binding on Defendants, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them. Defendants are further required to provide all such persons with actual notice of this Order and the restraints herein.

All other relief requested by Plaintiffs, Defendants, and Intervenors in the above styled and numbered case not expressly granted herein is hereby DENIED WITH PREJUDICE.

This is a final judgment disposing of all issues as to all parties.

SIGNED this 19th day of April, 2023.


_____
JUDGE PRESIDING
KARIN CRUMP
250TH DISTRICT COURT

5

# APPENDIX N

Sec. 12.03. - Excess revenues of utility systems.

(a) Any money remaining in the "System Fund" after all necessary expenses of operation and maintenance of the utility systems, including salaries, labor and materials, have been paid, upon proper approval, and after all payments have been made into the several funds required and provided to be made by the ordinance or ordinances authorizing the issuance of any revenue bonds of the city, now outstanding or hereafter authorized and issued which may be payable from and secured by a pledge of the net earnings of the light, water or sewer systems, shall be deemed "Excess Revenues" for the purposes of this section. "System Fund" as used herein shall mean the fund (or funds as may be required by outstanding bond issues) into which are deposited the gross incomes derived from the operation of the above named utility systems.

(b) Excess Revenues shall be utilized at the times and for the purposes as follows:

(1) After all of the requirements of the various funds have been met, there shall be computed a return on the net investment in the utility system. The "Net Investment" figure used in these computations shall be taken from the independent audit of the utility systems for the last fiscal period. The city shall be entitled to receive annually on the net investment from excess revenues, if any, not more than six (6) percent of the net investment.

(2) Any remaining excess revenues shall be used for the redemption and retirement of utility revenue bonds, as they become available at not more than fair market value. If utility revenue bonds are not available, these funds shall immediately be invested in short-term United States Government securities or at the option of the city, placed on time deposit in the city depository to draw interest. As utility revenue bonds become available, sufficient United States Government securities shall be sold or time deposits withdrawn to purchase the longest maturities available on the market.

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Cathy Daniels on behalf of Jose de la Fuente
Bar No. 00793605
cdaniels@lglawfirm.com
Envelope ID: 100850268
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief for Cross-Appellant DME
Status as of 5/15/2025 8:38 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Katherine Coleman | 24059596 | kcoleman@omm.com | 5/14/2025 5:28:47 PM | SENT |
| Jamie Mauldin | 24065694 | jmauldin@lglawfirm.com | 5/14/2025 5:28:47 PM | SENT |
| Gabrielle Smith | 24093172 | gsmith@lglawfirm.com | 5/14/2025 5:28:47 PM | SENT |
| David Laurent | | david.laurent@oag.texas.gov | 5/14/2025 5:28:47 PM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 5/14/2025 5:28:47 PM | SENT |
| Jose E.de la Fuente | | jdelafuente@lglawfirm.com | 5/14/2025 5:28:47 PM | SENT |
| Amy Hoffee | | amy.hoffee@cityofdenton.com | 5/14/2025 5:28:47 PM | SENT |
| Chris Ekoh | | chris.ekoh@opuc.texas.gov | 5/14/2025 5:28:47 PM | SENT |
| Justin Swearingen | | justin.swearingen@opuc.texas.gov | 5/14/2025 5:28:47 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 5/14/2025 5:28:47 PM | SENT |
| Colton Halter | | colton.halter@oag.texas.gov | 5/14/2025 5:28:47 PM | SENT |
| John Hubbard | | jhubbard@omm.com | 5/14/2025 5:28:47 PM | SENT |
| Christiana Segura | 24143396 | christiana.segura@opuc.texas.gov | 5/14/2025 5:28:47 PM | SENT |
| Roslyn Warner | | rwarner@lglawfirm.com | 5/14/2025 5:28:47 PM | SENT |
| Devin Alexander | | devin.alexander@cityofdenton.com | 5/14/2025 5:28:47 PM | SENT |
| Michael McMillin | | mmcmillin@omm.com | 5/14/2025 5:28:47 PM | SENT |
| Sharbel Sfeir | | sharbel.sfeir@opuc.texas.gov | 5/14/2025 5:28:47 PM | SENT |
| Marcella Lunn | | marcella.lunn@cityofdenton.com | 5/14/2025 5:28:47 PM | SENT |